RFE LAW FIRM, LLC
BY:    ROBERT ENGLERT, ESQUIRE
        JESSALYN L. COOL, ESQUIRE
Attorney I.D. No.: 203544/317802
105 Rutgers Avenue #249
Swarthmore, Pennsylvania 19081
Phone:  888.973.3529

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CLAUDIA R. DIBLASI, DO**<br><br>              **Plaintiff,**<br>   **v.**<br><br><br>**GUTHRIE/ROBERT PACKER HOSPITAL**<br>   and<br>**GUTHRIE MEDICAL GROUP, P.C.**<br>**f/d/b/a GUTHRIE CLINIC LTD.**<br><br>          **Defendants.** | **NO.**<br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff Claudia R. DiBlasi, DO ("Plaintiff" or "Dr. DiBlasi"), by and through the undersigned counsel, hereby files this Civil Action Complaint against the above-named Defendants, and as grounds in support thereof, alleges as follows:

### PARTIES & JURISDICTIONAL FACTS

1.     Dr. DiBlasi is an individual adult citizen of the Commonwealth of Pennsylvania currently residing at 702 Wilbur Avenue, Bradford, Pennsylvania 18840.

2.     Dr. DiBlasi graduated from Touro College of Osteopathic Medicine and was conferred the degree of Doctor of Osteopathic Medicine ("D.O.") in 2019.

3.     In 2019, Dr. DiBlasi accepted her invitation to the Family Medicine Residency Program ("Residency Program") at Guthrie/Robert Packer Hospital ("GRPH") based upon GRPH's representations that the Residency Program would be administered pursuant to the Accreditation Council for Graduate Medical Education ("ACGME") policies, standards, and requirements.

4.      Defendant Guthrie/Robert Packer Hospital was at all times relevant hereto an independent corporation, professional corporation, professional association, professional partnership, or other jural entity organized and existing under the laws of the Commonwealth of Pennsylvania.

5.      At all times relevant hereto, GRPH owned, maintained, operated and/or controlled a hospital located at 1 Guthrie Square, Sayre, Bradford County, Pennsylvania 18840.

6.      Defendant Guthrie Medical Group, P.C. f/d/b/a GUTHRIE CLINIC LTD. ("Guthrie Clinic") was at all times relevant hereto an independent corporation, professional corporation, professional association, professional partnership, or other jural entity organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1 Guthrie Square, Sayre, Bradford County, Pennsylvania 18840.

7.      At all times relevant hereto, GRPH and/or Guthrie Clinic implemented, supervised, and/or controlled The Guthrie Family Medicine Residency Program ("the Residency Program") which it purported to operate in accordance with the policies, standards, and requirements of the ACGME as a dually accredited osteopathic and allopathic program.

8.      On April 19, 2023, Plaintiff dual filed charges of discrimination based on gender, age, and disability with the United States Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").

9.      The EEOC undertook the investigation of Plaintiff's charges.

10.     By letter dated April 13, 2023, the EEOC notified Plaintiff of her right to sue within ninety (90) days thereafter.

11.     Jurisdiction is proper based upon 29 U.S.C. § 2617, 28 U.S.C. §1331 and §1343(a)(1),(3) and (4).

## OPERATIVE FACTS

12.     Dr. DiBlasi entered the Family Medicine Residency Program at GRPH in 2019 after completing medical school.

13.     At the time she started her Family Medicine Residency, Dr. DiBlasi was a forty-nine (49) year-old woman.

14.     As a condition of acceptance to the Residency Program, Dr. DiBlasi was required to sign the Guthrie/Robert Packer House Officer Agreement ("Agreement"), which also set forth the contractual terms and conditions of Dr. DiBlasi's employment by GRPH. *See* House Officer Agreement dated July 1, 2019 as Exhibit A.

15.     The Agreement provided that the education experience of the Residency Program would be conducted in compliance with the "Common" and "Program" Requirements of the ACGME.

16.     Before beginning the Residency Program, Plaintiff was diagnosed with ADD by Dr. Thandar A. Win of Catskill Regional Medical Center in 2017 and was treated with Atomoxetine.

17.     Plaintiff provided documentation to Defendants of her ADD disability during her residency. *See* Emails dated April 11, 2020 through April 15, 2020 attached hereto as Exhibit B.

18.     Plaintiff made numerous requests to Dr. Donald Phykitt, Danielle Terry, Ph.D., and Dr. Mark Corey for more engaging academic activities for development of skills because she found learning by lectures only incompatible with her disability.

19.     Defendants knew that Plaintiff suffered with a disability and that Plaintiff requested reasonable accommodations on numerous occasions. *Id.*

20.     In or around April 2020, Danielle Terry, Ph.D. approached Plaintiff under the guise of meeting with a specialist to help Defendants with a project to develop new pedagogical methods to tailor educational approaches for different learning styles among residents, to which Plaintiff agreed.

21.     Plaintiff was led to believe that these meetings were for research purposes and would provide data Defendants would use to develop new educational activities for residents.

22.    Plaintiff met with Jeffrey Donner, Ph.D., in Elmira, New York to participate in what she believed was a research project.

23.    After her meetings with Dr. Donner, Plaintiff learned that the true purpose of these meetings was to conduct a neuropsychological evaluation specific only to her and was not in any way related to improving pedagogical methods for residents or for her personally.

24.    Dr. Donner's evaluation did not include a diagnosis for ADD. Instead, Dr. Donner diagnosed Plaintiff as being depressed, which results he conveyed to at least Danielle Terry, Ph.D. and Dr. Mark Corey.

25.    Plaintiff did not knowingly consent to a medical evaluation or neuropsychological evaluation of her disability but rather was duped into a targeted and predatory evaluation that she was lead to believe was a research study.

26.    Plaintiff would not have consented to a neuropsychological evaluation if she had known that it was to "re-evaluate" her already diagnosed disability.

27.    As a result of Dr. Donner's evaluation, Defendants refused to provide Plaintiff with reasonable accommodations for her disability.

28.    During Plaintiff's first year of Residency, GRPH received approval from the ACGME to start a new anesthesiology residency program. As a result of the timing of the approval, there were three positions that were opened and would be filled outside of the traditional residency application and match process. *See* Emails dated May 5, 2020 attached hereto as Exhibit C.

29.    Plaintiff reached out to the Program Director, Dr. Burdett Porter, for the anesthesiology residency program and was initially informed that successful completion of her PGY-1 year in Family Medicine would likely meet the requirements for transfer into the anesthesiology residency program. *See* Emails dated October 3, 2019, attached hereto as Exhibit D.

30.     Plaintiff discussed a transfer with her advisor at the time, Dr. Danielle Terry, Ph.D.. Dr. Terry advised Plaintiff that she needed to speak with Dr. Donald Phykitt, the Program Director of the Family Medicine Residency.

31.     After speaking with Dr. Phykitt, Plaintiff was informed that a transfer would not be permitted.

32.     In October 2019, Dr. Porter informed Plaintiff that a transfer would not be possible because GRPH has an unwritten agreement not to accept transfers that would result in a loss of educational funding. *Id.*

33.     In May 2020, Dr. Porter again informed Plaintiff that while GRPH did receive ACGME approval for an Anesthesiology Residency because of her status as a PGY-1 she would not be eligible for the program because "your funding would cease after your PGY-3 year." *See* Emails dated May 5, 2020 attached hereto as Exhibit C.

34.     Blocking a transfer from one residency program to another is a violation of ACGME policies.

35.     Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 concerning "Acceptance and Transfer of Residents" provided to Plaintiff by Defendants "pertains to ACGME criteria for the acceptance and transfer of residents while in training." *See* Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 attached hereto as Exhibit E.

36.     Defendants' policy does not prevent a resident from transferring to another program based on educational funding.

37.     Plaintiff has since learned that Dr. William Wardell, a younger male GRPH Family Medicine Resident, was permitted to transfer into the orthopedic surgery residency program at GRPH even though Dr. Wardell will only receive a maximum of three (3) years educational funding as dictated by his original acceptance in the Family Medicine Residency Program.

38.     As a PGY-2 in Family Medicine, Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH , which was typically five (5) years, as a PGY-2 which meant he would have to complete his PGY-2 year a second time in that program.

39.     At the time Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH, Dr. Wardell was a categorical resident in the Family Medicine Residency Program.

40.     Despite the fact that Dr. Wardell's educational funding would have been cut short by three (3) years for his new program GRPH did not block his transfer from the GRPH Family Medicine Residency Program to the GRPH Orthopedic Surgery Residency Program.

41.     Plaintiff has also learned that Dr. Michael Gergel, a younger male GRPH Family Medicine PGY-3 resident, was allowed to transfer to the Emergency Medicine Residency Program at GRPH.

42.     At the time Dr. Gergel was permitted to transfer into the Emergency Medicine Residency Program at GRPH, Dr. Gergel was a categorical resident in the Family Medicine Residency Program.

43.     Even though Dr. Gergel had no educational funding available to him in the GRPH Emergency Medicine Residency Program, GRPH did not block his transfer from the GRPH Family Medicine Residency Program to GRPH Emergency Medicine Residency Program.

44.     The purported "policy" preventing transfers from one GRPH residency program to another based on "educational funding" was not universally applied and certainly not equally applied to Dr. Wardell, Dr. Gergel and Plaintiff.

45.     Both Dr. Wardell and Dr. Gergel are males who were approximately 28-30 years old at the time they were allowed to transfer out of the GRPH Family Medicine program and into different programs within GRPH.

46.     Throughout the course of her residency, Plaintiff endured numerous comments about her age, specifically, Dr. Rosita Sabet-Rasekh repeatedly told Plaintiff "It's difficult to learn after a certain age."

47.     During Plaintiff's PGY-2 Maternal Child Rotation evaluation, Dr. Donald Phykitt asked Dr. Michael Gergel, also a PGY-2 but a male resident, to evaluate Plaintiff's performance despite the fact that Dr. Gergel was not qualified to evaluate someone at his same training level.

48.     Plaintiff was denied similar treatment as was given to her younger male employees.

49.     Defendants retaliated against Plaintiff for making claims to both the EEOC and the PHRC.

50.     After Defendants learned of her claims, Defendants denied Plaintiff access to Defendants' facilities to complete her residency training with her peers.

51.     After Defendants learned of her claims, Defendants allowed Plaintiff's training license to expire and unreasonably delayed in taking necessary steps to reissue the same.

52.     After Defendants learned of her claims, Defendants required Plaintiff to finish the patient encounters she needed to complete the residency by means of virtual telehealth visits only.

53.     After Defendants learned of her claims, Defendants denied her the opportunity to recertify her ALS and BLS qualifications.

54.     After Defendants learned of her claims, Defendants denied Plaintiff the ability to be certified to perform paracentesis, which Plaintiff specifically notified Defendants was necessary for her job search.

55.     After Defendants learned of her claims, Defendants denied Plaintiff access, and continue to deny access, to her residency records that are necessary for her to secure employment.

56.     Despite the discrimination and retaliation Plaintiff faced she successfully completed the Family Medicine Program in 2023; however, she was deprived of the opportunity to become a Board Certified Anesthesiologist.

57.     As a direct and proximate cause of the Defendants' conduct set forth herein, Dr. DiBlasi has been caused to suffer past and future loss of earnings capacity, as well as damages awardable for each of the following counts.

## COUNT I
## DISCRIMINATION UNDER THE & PENNSYLVANIA HUMAN RELATIONS ACT ("PHRA")– FAILURE TO PROVIDE REASONABLE ACCOMODATIONS & HOSTILE WORKING ENVIRONMENT

58.     The previous averments are incorporated by reference as though set forth fully herein.

59.     Plaintiff is a member of a class of individuals protected against discrimination in the workplace on account of a disability, a record of disability, and/or the perception that Plaintiff is an individual with a disability, pursuant to 43 Pa.C.S. §951-963.

60.     Defendants are a covered entity employers pursuant to 43 Pa.C.S. §951(4)(b).

61.     As set forth more fully above, Plaintiff has been subjected to discrimination and retaliation on the basis of her disability, her record of disability, and/or Defendants' perception of her as an individual with a disability, in a manner affecting the terms and conditions of her employment and resulting in Defendants' failure to accommodate Plaintiff as well as their disparate treatment of her compared to her nondisabled coworkers.

62.     Plaintiff was capable of performing the essential functions of her job, as defined by 43 Pa.C.S. §951(4)(p), with reasonable accommodations.

63.     The reasonable accommodations required by Plaintiff did not constitute any significant hardship to Defendants.

64.     Plaintiff was diagnosed with ADD by Dr. Thandar A. Win of Catskill Regional Medical Center in 2017 and was treated with Atomoxetine.

65.     Plaintiff provided documentation to Defendants of her ADD disability during her residency.

66.     Plaintiff made numerous requests to Dr. Donald Phykitt, Danielle Terry, Ph.D., and Dr. Mark Corey for more engaging academic activities for development of skills because she found learning by lectures incompatible with her disability.

67.     Defendants knew that Plaintiff suffered with a disability and that Plaintiff requested reasonable accommodations on numerous occasions.

68.     In or around April 2020, Danielle Terry, Ph.D. approached Plaintiff under the guise of meeting with a specialist to help Defendants with a project to develop new pedagogical methods to tailor educational approaches for different learning styles among residents, to which Plaintiff agreed.

69.     Plaintiff was led to believe that these meetings were for research purposes and would provide data Defendants would use to develop new educational activities for residents.

70.     Plaintiff met with Jeffrey Donner, Ph.D., in Elmira, New York to participate in what she believed was a research project.

71.     After her meetings with Dr. Donner, Plaintiff learned that the true purpose of these meetings was to conduct a neuropsychological evaluation specific only to her and was not in any way related to improving pedagogical methods for residents or for her personally.

72.     Dr. Donner's evaluation did not include a diagnosis for ADD.

73.     Instead, Dr. Donner diagnosed Plaintiff as being depressed, which results he conveyed to at least Danielle Terry, Ph.D. and Dr. Mark Corey.

74.     Plaintiff did not knowingly consent to a medical or neuropsychological evaluation of her disability but rather was duped into a targeted and predatory evaluation that she was lead to believe was a research study.

75.     Plaintiff would not have consented to a neuropsychological evaluation if she had known that it was to "re-evaluate" her already diagnosed disability.

76.     As a result of Dr. Donner's evaluation, Defendants refused to provide Plaintiff with reasonable accommodations for her disability.

77.     Defendants possessed no legitimate business justification for its failure to accommodate the Plaintiff.

78.     Defendants subjected Plaintiff to discrimination and disparate treatment on the basis of Plaintiff's disability or Defendants' perception of Plaintiff as an individual with a disability.

79.     Defendants unlawfully considered Plaintiff's disability status in refusing to permit her to transfer into the Anesthesiology Residency Program.

80.     Defendants' unlawful discrimination and disparate treatment, as described more fully above, resulted in adverse employment actions against her and continued until the completion of her residency.

81.     Defendants willfully violated the PHRA when they discriminated against Plaintiff because of her actual disability or Defendants' perception of Plaintiff as an individual with a disability.

82.     By reason of the foregoing, the Defendants, acting through its servants, agents and employees, knowingly permitted and created a hostile work environment because of Plaintiff's disability. The discrimination was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Plaintiff's employment.

83.     The foregoing conduct would have detrimentally affected a reasonable person of the same protected class in the same position as the Plaintiff.

84.     As a result of Defendants' willful violations of the PHRA, Plaintiff has suffered damages, including loss of reputation, loss of opportunities, loss of future income and career opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

85.     As a direct and proximate cause of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands the full measure of compensatory and punitive damages awardable as a result of Defendants' violation of the PHRA as well as an award for Plaintiff's attorney's fees and litigations costs incurred in recovering said damages.

## COUNT II
## DISCRIMINATION UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA")-AGE DISCRIMINATION

86.     The previous averments are incorporated by reference as though set forth fully herein.

87.     Plaintiff was forty-nine (49) years of age when she accepted Defendants' invitation to the Residency Program at Guthrie/Robert Packer Hospital.

88.     During Plaintiff's first year of Residency, GRPH received approval from the ACGME to start a new anesthesiology residency program. As a result of the timing of the approval, there were three (3) positions that were opened and would be filled outside of the traditional residency application and match process.

89.     Plaintiff reached out to the Program Director, Dr. Burdett Porter, for the anesthesiology residency program and was initially informed that successful completion of her PGY-1 year in Family Medicine would likely meet the requirements for transfer into the anesthesiology residency program. *See* Emails dated October 3, 2019, attached hereto as Exhibit D.

90.     Plaintiff discussed a transfer with her advisor at the time, Dr. Danielle Terry, Ph.D.. Dr. Terry advised Plaintiff that she needed to speak with Dr. Donald Phykitt, the Program Director of the Family Medicine Residency.

91.     After speaking with Dr. Phykitt, Plaintiff was informed that a transfer would not be permitted.

92.     In October 2019, Dr. Porter informed Plaintiff that a transfer would not be possible because GRPH has an unwritten agreement not to accept transfers that would result in a loss of educational funding. *Id.*

93.     In May 2020, Dr. Porter again informed Plaintiff that while GRPH did receive ACGME approval for an Anesthesiology Residency because of her status as a PGY-1 she would not be eligible for the program because "your funding would cease after your PGY-3 year." *See* Emails dated May 5, 2020 attached hereto as Exhibit C.

94.     Blocking a transfer from one residency program to another is a violation of ACGME policies.

95.     Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 concerning "Acceptance and Transfer of Residents" provided to Plaintiff by Defendants "pertains to ACGME criteria for the acceptance and transfer of residents while in training." *See* Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 attached hereto as Exhibit E.

96.     Defendants' policy does not prevent a resident from transferring to another program based on educational funding.

97.     Plaintiff has since learned that Dr. William Wardell, a GRPH Family Medicine Resident was permitted to transfer into the orthopedic surgery residency program at GRPH even though Dr. Wardell will only receive a maximum of three (3) years educational funding as dictated by his original acceptance in the Family Medicine Residency Program.

98.     As a PGY-2 in Family Medicine, Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH , which was typically five (5) years, as a PGY-2 which meant he would have to complete his PGY-2 year a second time in that program.

99.     At the time Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH, Dr. Wardell was a categorical resident in the Family Medicine Residency Program.

100.     Despite the fact that Dr. Wardell's educational funding would have been cut short by three (3) years for his new program GRPH did not block his transfer from the GRPH Family Medicine Residency Program to the GRPH Orthopedic Surgery Residency Program.

101.     Plaintiff has also learned that Dr. Michael Gergel, a younger male GRPH Family Medicine PGY-3 resident, was allowed to transfer to the Emergency Medicine Residency Program at GRPH.

102.     At the time Dr. Gergel was permitted to transfer into the Emergency Medicine Residency Program at GRPH, Dr. Gergel was a categorical resident in the Family Medicine Residency Program.

103.    Even though Dr. Gergel had no educational funding available to him in the GRPH Emergency Medicine Residency Program, GRPH did not block his transfer from the GRPH Family Medicine Residency Program to the GRPH Emergency Medicine Residency Program.

104.    The purported "policy" preventing transfers from one GRPH residency program to another based on "educational funding" was not universally applied and certainly not equally applied to Dr. Wardell, Dr. Gergel, and Plaintiff.

105.    Both Dr. Wardell and Dr. Gergel are males who were approximately 28-30 years old at the time they were allowed to transfer out of the GRPH Family Medicine program and into different programs within GRPH.

106.    Plaintiff endured numerous comments over the duration of her residency about her age, specifically, Dr. Rosita Sabet-Rasekh repeatedly told Plaintiff "It's difficult to learn after a certain age."

107.    At all times relevant to this Complaint, the Defendants qualify as an "employer" and Dr. DiBlasi is an "eligible employee" as those terms are defined in 29 U.S.C. § 630.

108.    As set forth more fully above, Defendants violated the ADEA, 29 U.S.C. § 621-634, which prohibits an employer from discharging any individual or otherwise discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's age.

109.    Defendants' conduct in treating Dr. DiBlasi less favorably than younger employees in terms of job assignments, promotions, training opportunities and/or other benefits was a willful and knowing violation of the ADEA.

110.    Defendants' unlawful discrimination, as described more fully above, resulted in adverse employment actions, and continued until the completion of her residency.

111.    Defendants willfully violated the ADEA when they discriminated against Plaintiff because of her age, as more fully described above.

112.     As a result of Defendants' willful violations of the ADEA, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

113.     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendants and an award of compensatory and punitive damages from the date of this Complaint, and any accrued interest due on these amounts, as well as for Dr. DiBlasi's attorney's fees and litigations costs incurred in recovering said damages.

## <u>COUNT III</u>
### DISCRIMINATION UNDER PENNSYLVANIA HUMAN RELATIONS ACT-AGE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

114.     The previous averments are incorporated by reference as though set forth fully herein.

115.     Plaintiff was forty-nine (49) years of age when she accepted Defendants' invitation to the Residency Program at Guthrie/Robert Packer Hospital.

116.     During Plaintiff's first year of Residency, GRPH received approval from the ACGME to start a new anesthesiology residency program. As a result of the timing of the approval, there were three positions that were opened and would be filled outside of the traditional residency application and match process.

117.     Plaintiff reached out to the Program Director, Dr. Burdett Porter, for the anesthesiology residency program and was initially informed that successful completion of her PGY-1 year in Family Medicine would likely meet the requirements for transfer into the anesthesiology residency program. *See* Emails dated October 3, 2019 attached hereto as Exhibit D.

118.    Plaintiff discussed a transfer with her advisor at the time, Dr. Danielle Terry, Ph.D.. Dr. Terry advised Plaintiff that she needed to speak with Dr. Donald Phykitt, the Program Director of the Family Medicine Residency.

119.    After speaking with Dr. Phykitt, Plaintiff was informed that a transfer would not be permitted.

120.    In October 2019, Dr. Porter informed Plaintiff that a transfer would not be possible because GRPH has an unwritten agreement not to accept transfers that would result in a loss of educational funding. *Id.*

121.    In May 2020, Dr. Porter again informed Plaintiff that while GRPH did receive ACGME approval for an Anesthesiology Residency because of her status as a PGY-1 she would not be eligible for the program because "your funding would cease after your PGY-3 year." *See* Emails dated May 5, 2020 attached hereto as Exhibit C.

122.    Blocking a transfer from one residency program to another is a violation of ACGME policies.

123.    Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 concerning "Acceptance and Transfer of Residents" provided to Plaintiff by Defendants "pertains to ACGME criteria for the acceptance and transfer of residents while in training." *See* Guthrie Policy & Procedure, Policy #RPH-D-761-31, effective date 9/23/2019 attached hereto as Exhibit E.

124.    Defendants' policy does not prevent a resident from transferring to another program based on educational funding.

125.    Plaintiff has since learned that Dr. William Wardell, a GRPH Family Medicine Resident was permitted to transfer into the orthopedic surgery residency program at GRPH even though Dr. Wardell will only receive a maximum of three (3) years educational funding as dictated by his original acceptance in the Family Medicine Residency Program.

126.    As a PGY-2 in Family Medicine, Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH , which was typically five (5) years, as a PGY-2 which meant he would have to complete his PGY-2 year a second time in that program.

127.    At the time Dr. Wardell was permitted to transfer into the Orthopedic Surgery Residency Program at GRPH, Dr. Wardell was a categorical resident in the Family Medicine Residency Program.

128.    Despite the fact that Dr. Wardell's educational funding would have been cut short by three (3) years for his new program GRPH did not block his transfer from the GRPH Family Medicine Residency Program to the GRPH Orthopedic Surgery Residency Program.

129.    Plaintiff has also learned that Dr. Michael Gergel, a younger male GRPH Family Medicine PGY-3 resident, was allowed to transfer to the Emergency Medicine Residency Program at GRPH.

130.    At the time Dr. Gergel was permitted to transfer into the Emergency Medicine Residency Program at GRPH, Dr. Gergel was a categorical resident in the Family Medicine Residency Program.

131.    Even though Dr. Gergel had no educational funding available to him in the GRPH Emergency Medicine Residency Program, GRPH did not block his transfer from the GRPH Family Medicine Residency Program to the GRPH Emergency Medicine Residency Program.

132.    The purported "policy" preventing transfers from one GRPH residency program to another based on "educational funding" was not universally applied and certainly not equally applied to Dr. Wardell, Dr. Gergel and Plaintiff.

133.    Both Dr. Wardell and Dr. Gergel are males who were approximately 28-30 years old at the time they were allowed to transfer out of the GRPH Family Medicine program and into different programs within GRPH.

134.    Plaintiff endured numerous comments over the duration of her residency about her age, specifically, Dr. Rosita Sabet-Rasekh repeatedly told Plaintiff "It's difficult to learn after a certain age."

135.    At all times relevant to this Complaint, the Defendants qualified as an "employer" and Dr. DiBlasi was an "eligible employee" as those terms are defined in 43 P.S.§ 954(b).

136.    As set forth more fully above, Defendants violated the PHRA, 43 P.S.§ 954, which prohibits an employer from discharging any individual or otherwise discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's age.

137.    Defendants' conduct in treating Dr. DiBlasi less favorably than younger employees in terms of job assignments, promotions, training opportunities and/or other benefits was a willful and knowing violation of the Pennsylvania Human Relations Act.

138.    By reason of the foregoing, the Defendants, acting through its servants, agents and employees, knowingly permitted and created a hostile work environment because of Plaintiff's age. The discrimination was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Plaintiff's employment.

139.    The foregoing conduct would have detrimentally affected a reasonable person of the same protected class in the same position as the Plaintiff.

140.    Defendants' unlawful discrimination, as described more fully above, resulted in adverse employment actions and continued until the completion of her residency.

141.    Defendants willfully violated the PHRA when they discriminated against Plaintiff because of her age, as more fully described above.

142.    As a result of Defendants' willful violations of the PHRA, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

143.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands the full measure of compensatory and punitive damages awardable as a result of Defendants' violation of the PHRA as well as an award for Plaintiff's attorney's fees and litigations costs incurred in recovering said damages.

<u>COUNT IV</u>
**DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964-GENDER DISCRIMINATION**

144.    The previous averments are incorporated by reference as though set forth fully herein.

145.    As set forth more fully above, Defendants denied Plaintiff, a woman, a transfer to another GRPH residency, for which they admitted she was qualified, under a pretext of lost educational funding.

146.    Two (2) younger male doctors, Dr. Wardell and Dr. Gergel, were allowed to transfer out of the GRPH Family Medicine program and into other programs within GRPH despite not having remaining educational funding available to them.

147.    During Plaintiff's PGY-2 Maternal Child Rotation evaluation, Dr. Donald Phykitt asked Dr. Michael Gergel, also a PGY-2 but male resident, to evaluate Plaintiff's performance despite the fact that Dr. Gergel was not qualified to evaluate someone at his same training level.

148.    At all times relevant to this Complaint, the Defendants qualified as an "employer" and Dr. DiBlasi was an "eligible employee" as those terms are defined in 29 U.S.C. § 630.

149.    Defendants violated Title VII of the Civil Rights Act of 1964, which prohibits an employer from discharging any individual or otherwise discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's sex.

150.    Defendants' conduct in treating Dr. DiBlasi less favorably than younger male employees in terms of job assignments, promotions, training opportunities and/or other benefits was a willful and knowing violation of Title VII of the Civil Rights Act of 1964.

151.    Defendants' unlawful discrimination, as described more fully above, resulted in adverse employment actions.

152.    Defendants willfully violated Title VII when they discriminated against Plaintiff because of her sex, as more fully described above and continued until the completion of her residency.

153.    As a result of Defendants' willful violations of Title VII, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

154.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendants and an award of compensatory and punitive damages from the date of this Complaint, and any accrued interest due on these amounts, as well as for Dr. DiBlasi's attorney's fees and litigations costs incurred in recovering said damages.

<u>**COUNT V**</u>
**DISCRIMINATION UNDER THE PENNSYLVANIA HUMAN RELATIONS ACT-GENDER DISCRIMINATION & HOSTILE WORKING ENVIRONMENT**

155.    The previous averments are incorporated by reference as though set forth fully herein.

156.    As set forth more fully above, Defendants denied Plaintiff, a woman, a transfer to another GRPH residency, for which they admitted she was qualified, under a pretext of lost educational funding.

157.    Two (2) younger male doctors, Dr. Wardell and Dr. Gergel, were allowed to transfer out of the GRPH Family Medicine program and into other programs within GRPH despite not having remaining educational funding available to them.

158.    During Plaintiff's PGY-2 Maternal Child Rotation evaluation, Dr. Donald Phykitt asked Dr. Michael Gergel, also a PGY-2 but male resident, to evaluate Plaintiff's performance despite the fact that Dr. Gergel was not qualified to evaluate someone at his same training level.

159.    At all times relevant to this Complaint, the Defendants qualified as an "employer" and Dr. DiBlasi was an "eligible employee" as those terms are defined in 43 P.S. §954(b).

160.    Defendants violated the PHRA, which prohibits an employer from discharging any individual or otherwise discriminating against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's sex.

161.    Defendants' conduct in treating Dr. DiBlasi less favorably than younger male employees in terms of job assignments, promotions, training opportunities and/or other benefits was a willful and knowing violation of 43 P.S. §954.

162.    By reason of the foregoing, the Defendants, acting through its servants, agents and employees, knowingly permitted and created a hostile work environment because of Plaintiff's gender. The discrimination was sufficiently severe and pervasive to alter the terms, conditions, and privileges of Plaintiff employment.

163.    The foregoing conduct would have detrimentally affected a reasonable person of the same protected class in the same position as the Plaintiff.

164.    Defendants' unlawful discrimination, as described more fully above, resulted in adverse employment actions.

165.    Defendants willfully violated the PHRA when they discriminated against Plaintiff because of her sex, as more fully described above and continued until the completion of her residency.

166.    As a result of Defendants' willful violations of the PHRA, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

167.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe

anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands the full measure of compensatory and punitive damages awardable as a result of Defendants' violation of the PHRA as well as an award for Plaintiff's attorney's fees and litigations costs incurred in recovering said damages.

**COUNT VI**
**RETALIATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

168.    The previous averments are incorporated by reference as though set forth fully herein.

169.    The ADEA prohibits retaliation against an individual because such individual made a charge of discrimination. 42 U.S.C. §2000e-3.

170.    After Defendants learned that Plaintiff had made charges of discrimination under the ADEA, they engaged in unlawful retaliation by:

  a. Denying Plaintiff physical access to Defendants' facilities to complete her residency training with her peers;

  b. Allowing Plaintiff's training license to expire and unreasonably delaying in taking the necessary steps to reissue the same;

  c. Requiring Plaintiff to finish her requirements for completing the residency by means of virtual telehealth visits only;

  d. Denying her the opportunity to recertify her ALS and BLS qualifications;

  e. Denying her the ability to be certified to perform paracentesis which Plaintiff specifically notified Defendants was necessary for her job search;

  f. Failing to increase Plaintiff's hours to full-time status, which decreased Plaintiff's earnings and delayed her graduation from the Residency Program; and

  g. Denying Plaintiff access to her residency records that are necessary for her to secure employment.

171.    Defendants willfully violated the ADEA when they retaliated against Plaintiff.

172.    As a result of Defendants' willful violations of the ADA, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

173.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendants and an award of compensatory and punitive damages available under the ADEA from the date of this Complaint, and any accrued interest due on these amounts, as well as for Dr. DiBlasi's attorney's fees and litigations costs incurred in recovering said damages.

## COUNT VII
### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

174.    The previous averments are incorporated by reference as though set forth fully herein.

175.    Title VII prohibits retaliation against an individual because such individual made a charge of discrimination. 42 U.S.C. §2000e-3.

176.    After Defendants learned that Plaintiff had made charges of discrimination under Title VII, they engaged in unlawful retaliation by:

    a.    Denying Plaintiff physical access to Defendants' facilities to complete her residency training with her peers;

    b.    Allowing Plaintiff's training license to expire and unreasonably delaying in taking the necessary steps to reissue the same;

    c.   Requiring Plaintiff to finish her requirements for completing the residency by means of virtual telehealth visits only;

    d.   Denying her the opportunity to recertify her ALS and BLS qualifications;

    e.   Denying her the ability to be certified to perform paracentesis which Plaintiff specifically notified Defendants was necessary for her job search;

    f.   Failing to increase Plaintiff's hours to full-time status, which decreased Plaintiff's earnings and delayed her graduation from the Residency Program; and

    g.   Denying Plaintiff access to her residency records that are necessary for her to secure employment.

177.    Defendants willfully violated Title VII when they retaliated against Plaintiff.

178.    As a result of Defendants' willful violations of Title VII, Plaintiff has suffered damages, including loss of reputation, loss of future income and growth opportunities, damage to her career and earning capacity, loss of happiness and well-being, and other emotional distress and compensatory damages.

179.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered and will continue to suffer lost wages, lost earning capacity, extreme mental anguish, severe anxiety, personal humiliation, painful embarrassment, disruption of her personal life, and loss of enjoyment of life.

**WHEREFORE**, Plaintiff demands judgment against the Defendants and an award of compensatory and punitive damages available under the ADEA from the date of this Complaint, and any accrued interest due on these amounts, as well as for Dr. DiBlasi's attorney's fees and litigations costs incurred in recovering said damages.

<u>**COUNT VIII**</u>
**RETALIATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT**

180.    The previous averments are incorporated by reference as though set forth fully herein.

181.    Defendants retaliated against Plaintiff in violation of the PHRA, 43 P.S. 955(d) for filing her charges of discrimination in the following manner:

      a.   Denying Plaintiff physical access to Defendants' facilities to complete her residency training with her peers;

      b.   Allowing Plaintiff's training license to expire and unreasonably delaying in taking the necessary steps to reissue the same;

      c.   Requiring Plaintiff to finish her requirements for completing the residency by means of virtual telehealth visits only;

      d.   Denying her the opportunity to recertify her ALS and BLS qualifications;

      e.   Denying her the ability to be certified to perform paracentesis which Plaintiff specifically notified Defendants was necessary for her job search;

      f.   Failing to increase Plaintiff's hours to full-time status, which decreased Plaintiff's earnings and delayed her graduation from the Residency Program; and

      g.   Denying Plaintiff access to her residency records that are necessary for her to secure employment.

182.    Defendants' retaliation against Plaintiff was intentional and malicious and the adverse actions taken against Plaintiff were solely because Plaintiff pursued her rights under the PHRA.

**WHEREFORE**, Plaintiff demands the full measure of compensatory and punitive damages awardable as a result of Defendants' violation of the PHRA as well as an award for Plaintiff's attorney's fees and litigations costs incurred in recovering said damages.

**COUNT IX**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

183.    The previous averments are incorporated by reference as though set forth fully herein.

184.    As set forth herein above, Defendants conducted themselves in an extreme and outrageous manner and intentionally and/or recklessly caused severe emotional distress to Dr. DiBlasi because of

their intentional discrimination and by intentionally deceiving Dr. DiBlasi into undergoing a neuropsychological evaluation under false pretenses that it was for a research study.

**WHEREFORE**, Plaintiff demands judgment against the Defendants and an award of compensatory damages. Because Defendants' conduct was knowing, intentional, wilful, wanton and reckless, Dr. DiBlasi is entitled to an award of punitive damages against Defendants to deter them and others similarly situated from engaging in similar acts in the future.

<u>**COUNT X**</u>
**BREACH OF CONTRACT**

185.    The previous averments are incorporated by reference as though set forth fully herein.

186.    At all times relevant hereto, the House Officer Agreement ("Agreement") signed by Plaintiff and Defendants was a lawful, binding, and enforceable contract. *See* Agreement attached hereto as Exhibit A.

187.    According to the Agreement, Defendants were required to abide by ACGME compliant Graduate Medical Education Policies and Procedures.

188.    The ACGME Guidelines permit residents to transfer from one residency program to another.

189.    Defendants' GME Policies and Procedures did not prohibit Plaintiff from transferring from her Family Medicine residency to a specialized residency in Anesthesiology, which upon completion would have substantially increased Plaintiff's earning capacity.

190.    Defendants breached the Agreement and their own policies and procedures by prohibiting Plaintiff from transferring to the Anesthesiology residency.

191.    As a direct and proximate result of Defendants' breach of contract, Dr. DiBlasi has suffered economic losses and consequential damages including:

        a.    Past lost earning and earnings capacity, including perquisites and benefits, Dr. DiBlasi expected to earn as a Board Certified Anesthesiologist upon the timely completion of her residency through the present;

      b.  Future lost earnings and earnings capacity, including perquisites and benefits, Dr. DiBlasi expected to earn as a Board Certified Anesthesiologist from the timely completion of her residency until her retirement from medical practice.

**WHEREFORE**, Plaintiff demands judgment in her favor and an award of damages to the fullest extent allowed by law, as a result of Defendants' breach of the Agreement.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,

RFE LAW FIRM, LLC

Date:   07.07.2023       By: _____

**ROBERT ENGLERT, ESQUIRE**
**JESSALYN L. COOL, ESQUIRE**
Attorney I.D. No.: 203544/317802
105 Rutgers Avenue #249
Swarthmore, Pennsylvania 19081
Phone:   888.973.3529
Fax:     888.251.2657
*Attorneys for Plaintiff*