## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLAUDIA DIBLASI, | No. 4:23-CV-01136 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| GUTHRIE/ROBERT PACKER HOSPITAL *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### NOVEMBER 22, 2023

## I.    BACKGROUND

In August 2023, Claudia DiBlasi filed a ten-count complaint against Guthrie/Robert Packer Hospital ("GRPH") and Guthrie Medical Group, P.C., doing business as Guthrie Clinic Ltd. ("Guthrie").[1] In September 2023, Defendants filed a partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[2] The motion is now ripe for disposition; for the reasons that follow, it is denied as to Counts II, IV, VI, and VII and granted as to Counts IX and X.

---

[1]    Doc. 1.
[2]    Doc. 10.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[3] and *Ashcroft v. Iqbal*,[4] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[5] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[6]

When deciding a motion to dismiss, a court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[7] Normally, to consider anything beyond those sources, a motion to dismiss must be

---

[3]    550 U.S. 544 (2007).
[4]    556 U.S. 662 (2009).
[5]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[6]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).
[7]    *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

converted to a motion for summary judgment.[8]   But consideration of materials outside the complaint is not completely barred on a Rule 12(b)(6) motion.   Courts may consider any documents that are integral or explicitly relied upon in the complaint.[9]   "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[10]   "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[11]   It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document.[12]   In this matter, this Court finds that these conditions have been met, and will consequently consider Defendants' attachments:   DiBlasi's charge of discrimination and her right to sue letters. But the Court will not consider DiBlasi's post-complaint attachments.

Courts have held that both charges of discrimination[13] and right to sue letters are integral to an employment discrimination complaint.[14]   The complaint also references the letter (the "April Notice") by stating: "by letter dated April 13, 2023,

---

[8]   *See* Fed. R. Civ. P. 12(d).

[9]   *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[10]   *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[11]   *Id.*; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

[12]   *Faulkner*, 463 F.3d at 134.

[13]   *Braddock v. SEPTA*, No. 13-06171, 2014 U.S. Dist. LEXIS 165235, at *16 (E.D. Pa. Nov. 25, 2014).

[14]   *See, e.g.*, *Formato v. Mount Airy #1, LLC*, No. 3:19-CV-02237, 2020 U.S. Dist. LEXIS 134195, at *7 (M.D. Pa. July 29, 2020).

the EEOC notified Plaintiff of her right to sue."[15] Inspecting the April Notice reveals that it is not a right to sue letter at all, but rather a reminder of a previous right to sue letter. The April Notice states that the EEOC "issued the enclosed Dismissal and Notice of Rights (Notice) in the above-referenced charge on the date reflected thereon."[16]

The March 3, 2023 letter (the "March Notice") attached by Defendants is the original right to sue letter, so it would ordinarily be considered integral to an employment discrimination complaint. As discussed, materials outside of a complaint cannot be considered where there exist "material disputed issues of fact" regarding the document's relevance.[17] And where a document is purportedly integral to the complaint because of its receipt by the plaintiff, one such disputed issue of fact prohibiting its consideration is whether the plaintiff actually received it at all.[18] But as the contents of the April Notice reveal, the March Notice is both enclosed with and incorporated by reference into the April letter. Therefore, while there is an issue of fact as to when the March letter was *initially* received by DiBlasi, there is no dispute of fact that she received it on April 13, 2023, when she received the April letter, nor does DiBlasi contend that it is an inauthentic copy of EEOC records. It is

---

[15] Doc. 1 ¶10.
[16] Doc. 12-3 at 2.
[17] *Faulkner*, 463 F.3d at 134.
[18] *Id.* at 134-135.

therefore appropriate for the Court to consider both letters in the undisputed context of DiBlasi's receipt of them on April 13, 2023.

However, the Court will not consider DiBlasi's other attachments, which include various documents obtained from the EEOC via DiBlasi's Freedom of Information Act (FOIA) requests. These attachments include email chains regarding technical issues accessing the EEOC portal and EEOC event logs, both of which bear upon whether DiBlasi received the March Notice. They are only tangentially related to the complaint and letters, as the complaint makes no allegations about the EEOC's communications and only states that DiBlasi received notice in April.

Furthermore, "a document is not a public record for purposes of a motion to dismiss solely because it might be subject to disclosure under FOIA."[19] So because these documents are not integral to DiBlasi's complaint, the Court will not consider them on this motion to dismiss.

### B.    Facts Alleged in the Complaint

This motion revolves around a medical resident's denial of accommodations, unsuccessful attempt to transfer to a different residency program, and subsequent filings in this Court. The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

---

[19]    *Pension Benefit Guar. Corp.*, 998 F.2d at 1197.

After completing medical school, Dr. DiBlasi entered GRPH's Family Medicine Residency Program in 2019.[20] At this time, she was a forty-nine-year-old woman.[21] As a condition of acceptance to the Residency Program, DiBlasi signed the GRPH House Officer Agreement (the "Agreement"), which outlined the terms of her employment.[22] As relevant to this motion to dismiss, DiBlasi's complaint centers on two incidents—a non-consensual diagnosis obtained to deny her accommodations, and a refusal to allow her transfer to another residency department.

Before DiBlasi began the Residency Program, she was diagnosed with Attention Deficit Disorder (ADD) in 2017.[23] DiBlasi provided documentation of her ADD disability during her residency and requested that GRPH provide accommodations by making academic activities more engaging.[24] These requests were made to Doctors Donald Phykitt, Danielle Terry, and Mark Corey.[25] Phykitt was the Program Director of DiBlasi's Family Medicine residency program.[26] Terry was DiBlasi's advisor.[27] Corey's position or role is not specified in the complaint.

Around April 2020, Terry approached DiBlasi with the purported aim of meeting with a specialist so that GRPH could develop new educational approaches

---

[20] Doc. 1 ¶12.
[21] *Id.* ¶13.
[22] *Id.* ¶14.
[23] *Id.* ¶16.
[24] *Id.* ¶¶18-19.
[25] *Id.* ¶18.
[26] *Id.* ¶30.
[27] *Id.*

tailored to different learning styles among residents.[28] DiBlasi agreed and was led to believe that these meetings were for research purposes.[29] But DiBlasi alleges that the true purpose of these meetings was actually to conduct a neuropsychological evaluation of her without her consent.[30] After DiBlasi's meetings with Dr. Jeffrey Donner, Donner diagnosed DiBlasi with depression rather than ADD, and conveyed these results to Terry and Corey.[31] Defendants then used this information to assert that DiBlasi did not actually have ADD, and therefore to refuse the accommodations DiBlasi requested.[32]

During DiBlasi's first year of residency, GRPH received approval from the Accreditation Council for Graduate Medical Education ("ACGME") to start a new anesthesiology residency program.[33] Three positions for the program would be filled outside of the traditional residency application and match process.[34] After learning of the new program, DiBlasi reached out to Dr. Burdett Porter, the program director, and was informed that successful completion of her first year of residency in Family Medicine would likely meet the requirements to transfer into the anesthesiology residency program.[35] Phykitt informed DiBlasi that a transfer would not be

---

[28] *Id.* ¶20.
[29] *Id.* ¶21.
[30] *Id.* ¶23.
[31] *Id.* ¶¶22, 24.
[32] *Id.* ¶¶26-27.
[33] *Id.* ¶28.
[34] *Id.*
[35] *Id.* ¶29.

permitted, purportedly because GRPH had an unwritten agreement not to accept transfers that would result in a loss of educational funding.[36] Around this time, however, two younger male residents' requests to transfer out of the Family Medicine residency program had been approved even though their transfers resulted in a loss of educational funding.[37] Following DiBlasi's complaints to the Pennsylvania Human Relations Commission and Equal Opportunity Employment Commission, DiBlasi alleges that Defendants engaged in various retaliatory acts.[38]

On April 19, 2022, DiBlasi filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC").[39] The EEOC investigated her charges, and ultimately issued a right to sue letter.[40]

DiBlasi's complaint alleges only the following about the right to sue letter: "By letter dated April 13, 2023, the EEOC notified Plaintiff of her right to sue within ninety (90) days thereafter."[41] The April Notice states:

> The United States Equal Employment Opportunity Commission (EEOC) issued the enclosed Dismissal and Notice of Rights (Notice) [the March Notice] on the date reflected thereon. Specifically, on that date, EEOC sent you an email notification that EEOC had made a decision regarding the above-referenced charge and advised you to

---

[36] *Id.* ¶¶31-33.

[37] *Id.* ¶¶37-43, 45. DiBlasi pleads other facts relevant to discriminatory animus. But the merits of her discrimination claims are irrelevant to this motion to dismiss, which focuses only on the statute of limitations applicable to these claims.

[38] Doc. 1 ¶¶50-57.

[39] *Id.* ¶8; Doc. 12 at 7 n.2.

[40] Doc. 1 ¶¶9-10.

[41] *Id.* ¶10.

download a copy of the decision document from the Portal. Our records indicate you have not downloaded the Notice from the Portal . . . Please note that if you want to pursue this matter further in court, you must file a lawsuit within 90 days of the date you receive the Notice.[42]

The earlier letter is dated March 3, 2023 and provides the original notice of DiBlasi's right to sue.[43] While the letter's header contains DiBlasi's residential address, the copy provided by the parties is an email copy which cc's Defendants and their counsel.[44]

DiBlasi now brings various Federal and Pennsylvania age, sex and disability-based discrimination claims,[45] Federal and Pennsylvania retaliation claims,[46] a Pennsylvania intentional infliction of emotional distress ("IIED") claim,[47] and a Pennsylvania breach of contract claim.[48] Defendants assert a statute of limitations defense DiBlasi's Federal discrimination claims[49] and move to dismiss the IIED and breach of contract claims because they are insufficient as a matter of law. For the reasons stated below, the Court grants the motion to dismiss as to DiBlasi's IIED and breach of contract claims.

---

[42]  12-3 at 2.
[43]  Doc. 10-4.
[44]  *Id.* at 2.
[45]  Doc. 1 at 8, 11, 14, 19.
[46]  *Id.* at 21-23.
[47]  *Id.* at 24.
[48]  *Id.* at 25.
[49]  Defendant moves to dismiss Counts II (Age Discrimination Under the ADEA), IV (Gender Discrimination under Title VII), VI (Retaliation Under the ADEA), and VII (Retaliation Under Title VII) as time-barred. Doc. 10 ¶ 12.

### C.    Analysis

### 1.    Statute of Limitations

Title VII employment discrimination suits are subject to two filing deadlines. An initial complaint must be filed with the EEOC within 180 days of the adverse employment action, or 300 days if there has been cross-filing with a state agency.[50] If the EEOC decides not to prosecute the case, it will issue the complainant a right to sue letter. This triggers the second filing deadline: if the complainant wishes to bring a civil action herself, she must file her complaint within 90 days of her receipt of the right to sue letter.[51] The 90-day period is treated as a statute of limitations.[52] It is strictly construed and "in the absence of some equitable bases for tolling, a civil suit filed even one day late is time-barred and may be dismissed."[53] The filing window does not actually commence until the plaintiff's receipt of the notice.[54] A statute of limitations defense may be raised in a 12(b)(6) motion, "but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'"[55]

---

[50]   42 U.S.C. § 2000e-5(e)(1).

[51]   42 U.S.C. § 2000e-5(f)(1). Although the ADEA does not require the EEOC to issue a right to sue letter before filing suit, where the EEOC does issue a right to sue letter, the ADEA plaintiff must still file within 90 days of receipt. *Covington v. URS Corp.*, 2013 U.S. Dist. LEXIS 70755, at *7 (D.N.J. May 20, 2013 (citing 29 U.S.C. § 626(e)).

[52]   *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001).

[53]   *Id.*

[54]   *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 239 (3d Cir. 1999).

[55]   *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)) (footnote omitted).

The parties dispute whether the March or April Notice marks DiBlasi's first notice of her right to sue. Defendants contend that DiBlasi received the March Notice through email notification and regular mail; this would mean that DiBlasi's complaint was filed 126 days after receipt of notice, barring her claim.[56] DiBlasi states that the first right to sue letter she received was the April Notice; this would mean that DiBlasi's complaint was filed 85 days after receipt of notice, allowing her claim.[57]

On a motion to dismiss, this Court may not resolve factual or credibility issues; it must assume DiBlasi's allegations to be true.[58] And DiBlasi alleges that she received her first notice in April, not in March. Nothing in the complaint or any of the other documents considered by the Court renders that allegation implausible. The parties dispute an issue of fact, not an issue of law.

The notices themselves prove very little. The March Notice was emailed to defendants' counsel, but "[t]he Court cannot assume that just because Defendant received email notice" in March "that Plaintiffs or their counsel also received such notice."[59] Nor does the April Notice's reference to the March Notice confirm that the March Notice was actually received.[60] Defendants contend that because the April

---

[56] Doc. 10 at 4-5.

[57] Doc. 12 at 9.

[58] *Acevedo v. Monsignor Donovan High Sch.*, 420 F.Supp.2d 337, 342 (D.N.J. 2006); *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir. 2001).

[59] *Herdman v. L-J-L Trucking, Inc.*, No. 3:21-213, 2023 U.S. LEXIS 57716, at *6-7 (W.D. Pa. Mar. 31, 2023).

[60] *Id.* at 7.

letter explicitly states that the EEOC sent DiBlasi an email notification in March, DiBlasi must have received it.[61] But while this certainly creates an issue of fact, it is not implausible that the EEOC was simply mistaken. The April Notice itself states that DiBlasi had not yet downloaded the right to sue letter from the online portal, and the March Notice does not show that DiBlasi was cc'd to the email notification. On these facts, it is plausible that the EEOC was mistaken.

Defendants next claim that even if DiBlasi never received the March email notification, she has somehow conceded receiving the March Notice through regular mail because she did not provide briefing on this issue. This argument loses sight of the focus of a motion to dismiss—the complaint. The complaint and the March and April Notices state nothing about whether the March Notice was actually mailed to DiBlasi's address. While the March letter's header contains DiBlasi's residential address, this fact does not conclusively establish that it was actually mailed there. So this argument is an attempt by Defendants to insert new factual allegations into the complaint, which is impermissible on a motion to dismiss.[62] In sum, neither the

---

[61] *See* Doc. 13 at 8.

[62] Even if this Court were to convert the motion to a motion for summary judgment, the record would be too incomplete to resolve the factual dispute as to when and how DiBlasi received the March Notice. Her attached email chains enforce the plausibility of her argument by demonstrating technical issues with the EEOC online system, and her EEOC event log shows that at least some change was made to her contact information before the March notice was sent. The EEOC event log does not belie her claim; it only states "Contact with Charging Party record added" on a March 6, 2023 entry. 12-2 at 101. The significance of this log is unclear and it does not conclusively establish Defendants' version of events.

complaint nor any properly-noticed documents establish that DiBlasi's claims are time-barred. Consequently, Defendants' motion to dismiss on that ground is denied.

## 2.    Intentional Infliction of Emotional Distress

Under Pennsylvania law, a plaintiff states a claim for intentional infliction of emotional distress by pleading that "a person [] by extreme and outrageous conduct intentionally or recklessly cause[d] her severe or emotional distress."[63] Outrageous conduct "go[es] beyond all bounds of decency and [is] regarded as utterly intolerable in a civilized community."[64] As "'the definition of 'outrageousness' is subjective and nebulous . . . the availability of recovery for IIED is 'highly circumscribed.'"[65]

DiBlasi cites cases involving the "propagation of falsehoods" to argue that the deception involved in her neuropsychological analysis should be considered "outrageous." [66] As the cases cited by DiBlasi show, however the "propagation" of falsehoods involves communicating them to others to defame or injure the plaintiff, not simply deceiving her.[67]  DiBlasi also cites cases in which landlords evict tenants

---

[63]   *Carson v. City of Phila.*, 574 A.2d 1184, 1187 (Pa. Cmwlth Ct. 1990) (citing RESTATEMENT (SECOND) TORTS § 46).

[64]   *Id.*

[65]   *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa. Super. Ct. Aug. 30, 2016) (citing *Kazatzky v. King Memorial Park*, 527 A.2d 988, 995 (Pa. 1987)).

[66]   Doc. 12 at 14-15.

[67]   *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1275 (3d Cir. 1979) (physician knowingly supplied newspaper reporters with false information that a football player was suffering from a grave or fatal illness); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236, 1238 (Pa. 1981) (hospital employees intentionally misstated a victim's cause of death so that plaintiff would be falsely accused).

through deception.[68] Such IIED claims are an outgrowth of the principle that "[w]here some special relationship exists, the test has been more relaxed"[69] because the "extreme abuse of position" by "police officers, school authorities, landlords, and collecting creditors" is outrageous.[70] Courts have declined to apply this principle to the employment relationship.[71]

Both the Supreme Court of Pennsylvania and the United States Court of Appeals for the Third Circuit have noted that "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for the tort of intentional infliction of emotional distress."[72] "'While loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for intentional infliction of emotional distress."[73]

Courts have not found IIED claims where employers injure their employees through intentional deception.[74] In *Cautilli v. GAF Corp.*, for example, an employer

---

[68] *Williams v. Guzzardi*, 875 F.2d 46 (3d Cir. 1989); *see also Fair v. Negley*, 390 A.2d 240 (Pa. 1978); *Beasley v. Freedman*, 389 A.2d 1087 (Pa. Super. Ct. 1978).

[69] *Bradshaw v. General Motors Corp., Fisher Body Div.*, 805 F.2d 110, 114-115 (3d Cir. 1986).

[70] RESTATEMENT (SECOND) TORTS § 46 cmt. e (1965); *Cautilli*, 531 F.Supp. at 75.

[71] *Bradshaw*, 805 F.2d at 115 ("Nor do we conclude that the employer-employee status is a special relationship similar to that of landlord-tenant").

[72] *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Cox v. Keystone Carbon*, 861 F.2d 390, 395 (3d Cir. 1988)).

[73] *Cox*, 861 F.2d at 395 (quoting *Brieck v. Harbison-Walker Refractories*, 624 F.Supp. 383, 367 (W.D. Pa. 1985)).

[74] *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 74 (E.D. Pa. 1982); *Madreperla v. Willard Co.*, 606 F.Supp. 874, 880 (E.D. Pa. 1985) (employer engaged in a premeditated plan to force employee out of his job); *Ebert v. Genpact Ltd.*, No. 3:21-CV-00980, 2022 U.S. Dist. LEXIS 60583 (M.D. Pa. Mar. 31, 2022).

promised his employee a promotion and substantial salary increase if he committed himself to continued employment, causing the employee to forego other job offers.[75] This offer was allegedly a ruse meant to ensure that the employee's departure would not impact the department's purchase price when the employer sold it to another company.[76] The Eastern District of Pennsylvania dismissed the case, stating that this scenario "pales before" the conduct alleged in successful IIED cases, including "withholding a dead child's body from its parents,"[77] "a surgeon's knowingly misrepresenting the severity of a child's medical condition to its parents,"[78] or "a physician knowingly supplying newspaper reporters with false information that a football player was suffering from a grave, possible fatal, illness."[79] Likewise, in *Ebert v. Genpact, Ltd.*, my colleague, the Honorable Jennifer P. Wilson, dismissed an IIED claim where an employer requested that an employee take a purportedly anonymous survey, on which he raised a complaint; the survey was not in fact anonymous, and the employer immediately retaliated for the complaint.[80]

Both *Cautilli* and *Ebert* involved employers intentionally deceiving employees into courses of action which harmed the employee or were used against him. DiBlasi presents a parallel situation; she was deceived into participating in a

---

[75]   531 F.Supp. at 71-72.

[76]   *Id.* at 72.

[77]   *Id.* at 74 (citing *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970)).

[78]   *Id.* (citing *Hume v. Bayer*, 428 A.2d 966 (N.J. 1981)).

[79]   *Id.* (citing *Chuy*, 595 F.2d 1265).

[80]   *Ebert*, 2022 U.S. Dist. LEXIS 60583, at *2-3.

diagnostic test under false pretenses, which was used to deny her ADD accommodations. As in *Cautilli* and *Ebert*, DiBlasi's allegations of workplace deception are insufficient to state an IIED claim as a matter of law. The Third Circuit stated in 1988 that "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee."[81] That observation does not seem to have changed in the years since. Accordingly, DiBlasi's IIED claim is dismissed with prejudice.

### 3. Breach of Contract

"It is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) the resultant damages."[82] DiBlasi argues that Defendants[83] breached the Agreement by refusing to allow her transfer to the Anesthesiology unit, or alternatively, that a breach occurred when Phykitt denied her

---

[81]   *Cox*, 861 F.2d at 395; *see, e.g.*, *Bowersox v. P.H. Glatfelter Co.*, 677 F.Supp. 307, 310-11 (M.D. Pa. 1988) (collecting cases).

[82]   *412 N. Front St. Assoc. v. Spector Gadon & Rosen, P.C.*, 151 A.3d 646, 657 (Pa. Super. Ct. 2016) (quoting *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman*, P.C., 137 A.3d 1247, 1258 (Pa. 2016)).

[83]   Because DiBlasi argues in her brief in opposition that she was employed by GRPH rather than Guthrie, Defendants state in their reply brief: "[t]o the extent Plaintiff admits that no employer-employee relationship ever existed between her and Guthrie Medical Group, P.C. f/d/b/a Guthrie Clinic LTD ("Guthrie Medical Group"), Guthrie Medical Group should be dismissed as a defendant in this matter." Doc. 13 at 11-12. However, Guthrie provides no other briefing on this issue and never moved to dismiss on this basis. Guthrie also makes no argument as to why it cannot be a defendant based on the complaint; its argument it solely based on DiBlasi's alleged concession in her brief in opposition. The Court therefore declines to rule on this issue.

transfer request outright rather than providing Dr. Porter with her application materials.[84] DiBlasi contends that these duties are contained in the ACGME guidelines and the hospital's own policies and procedures, both of which are incorporated by reference into her contract. Defendants respond that neither set of rules are incorporated into her contract, but that even if they are, they do not establish the duties alleged by DiBlasi.  While DiBlasi's interpretive argument is somewhat convoluted, resolving it is simple; the language she identifies imposes no duties on Defendants at all, nor is it even part of the Agreement.

"The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties."[85] "In cases of written contract, the intent of the parties is the writing itself."[86] "The parties' intention must be ascertained from the document itself, if its terms are clear and unambiguous."[87] "The document is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in

---

[84] This allegation only appears in DiBlasi's brief in opposition, not her complaint. It is therefore an impermissible attempt to amend the pleadings. *See Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"). But this fact makes no difference to the resolution of Defendants' motion.

[85] *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) (citing *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973)).

[86] *Id.* (citing *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 145 A.2d 672 (Pa. 1958)).

[87] *Mun. Auth. of Midland v. Ohioville Borough Mun. Auth.*, 108 A.3d 132, 139 (Pa. Cmwlth Ct. 2015) (citing *Sun Co. (R&M) v. Pa. Turnpike Comm'n*, 708 A.2d 875, 878 (Pa. Cmwlth. Ct. 1998)).

more than one sense."[88] "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact."[89]

Because the Agreement unambiguously imposes neither of the duties alleged by DiBlasi, she fails to state a breach of contract claim as a matter of law. DiBlasi asserts that the Agreement incorporates two rules by reference: an unspecified ACGME Guideline, and Hospital Policy #RPH-D-761-31 (the "Hospital Policy"). The complaint states that "ACGME Guidelines permit residents to transfer from one residency program to another,"[90] yet the fact that transfers are generally permitted does not clarify what duties directors owe to allow or facilitate them. The Hospital Policy "pertains to ACGME criteria for the acceptance and transfer of residents while in training,"[91] but it likewise does not appear to impose either of the alleged duties.[92] But even assuming that the policy does impose some requirement on program directors to allow or facilitate their residents' transfer to other programs, it

---

[88]  *Id.*
[89]  *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citing *Community College v. Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)).
[90]  Doc. 1 ¶188.
[91]  Doc. 1-6.
[92]  The "Eligibility Criteria" provision appears to impose duties on the director of the program to which a prospective transferee applies to evaluate the candidate's eligibility in accordance with ACGME Guidelines. The "Procedure: Resident Transfers Requirements" section requires the director of a transferee resident's original program to provide documents to the director of her new residency program but is silent as to any duty before the transfer is complete, much less a duty to approve or facilitate the transfer.

18

is not incorporated into the Agreement, and so failing to adhere to that requirement is not a breach of the Agreement.[93]

Connecting the Agreement to the ACGME Guidelines and Hospital Policy requires several layers of incorporation by reference. DiBlasi's contract defines her position as a "House Officer," and sets out the "House Officer Duties and Responsibilities" in Section II.[94] The first subsection states: "A description of the educational experience of the Residency Training Program, including the nature of the assignments to other programs or institutions, is provided in Exhibit A, which is attached hereto and made part of this Agreement by reference."[95] Exhibit A is titled "Robert Packer Hospital Position Description."[96] DiBlasi points to the following language in Exhibit A, which falls under the "Main Function" heading:

> Family Medicine Residents learn the specialty of Family Medicine by active participation in patient care and educational activities. These activities must be in compliance with the Common and Program Requirements of the Accreditation Counsel for Graduate Medical Education [ACGME] . . . and the hospital's policies, procedures and regulatory requirements.[97]

---

[93] If these policies are not actually incorporated by reference into the agreement itself, the default presumption is that they are not legally binding terms of the employment contract. *See Consolmagno v. Home Depot*, No. 1097, 2006 U.S. Dist. LEXIS 88332, at \*10-11 (W.D. Pa. Dec. 6, 2006) (citing *Luteran v. Loral Fairchild Corp.*, 688 A.2d 211, 214-15 (Pa. Super. Ct. 1997)); *see also Martin v. Capital Cities Media, Inc.*, 511 A.2d 830, 836-38 (Pa. Super. Ct. 1986). While an employer's policy or handbook might in some circumstances create an implied contract, the plaintiff does not plead this legal theory, so the Court does not opine on it further. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 939-949 (Pa. Super. Ct. 2011) (per curiam).

[94] Doc. 1-2 at 2, 3-4.

[95] *Id.* at 2.

[96] Doc. 12-4 at 8.

[97] *Id.* at 1.

DiBlasi interprets this to mean that every party involved in the Family Medicine Residents' activities must abide by all ACGME and Hospital Policies. But the plain meaning of this provision indicates that it regulates only residents' conduct, and that it only reaches limited activities. The first sentence focuses on the "participation" of "Family Medicine Residents" in "patient care and educational activities," so the second sentence is most reasonably read as requiring only the Family Medicine Residents' "compliance" with ACGME Guidelines and Hospital Policies. And by requiring compliance while performing "these activities," it refers to the antecedent "patient care and educational activities," not the activity of transferring to another residency program. It is also less likely that the cited policies encompass the transfer process because they are described in a paragraph setting out residents' duties. "In the employment context" the terms policies, procedures, and regulatory requirements, like the terms "'rule' or 'regulation,' carry with them a connotation of requirement and are normally considered to be principles designed to govern the behavior of employees while at work."[98]  It is more likely that these policies, procedures, and regulatory requirements "relate to the day to day operation of the business and the employee's responsibility thereto."[99]

---

[98] *Reilly v. Stroehmann Bros. Co.*, 532 A.2d 1212, 1214-15 (Pa. Super. Ct. 1987) (en banc).

[99] *Id.* at 532 A.2d at 1214-15 (inferring that when a contractual provision required employees to follow "rules" and "regulations," the use of the terms rule and regulation "relate to the day to day operation of the business and the employee's responsibility thereto" and thus that contractual provision did not incorporate an arbitration policy).

The surrounding context of the provision eliminates any remaining ambiguity.[100] As noted, this language is incorporated by reference under Section II of the contract, which specifies the "House Officer Duties and Responsibilities."[101] This indicates that the clauses enumerated under Section II set out duties held by DiBlasi (the house officer) rather than Defendants. Likewise, the title of Exhibit A itself, "Robert Packer Hospital Position Description," also indicates that it sets out the duties of the resident position rather than the duties owed by the hospital. Finally, the provision's location under the heading "Main Function" undermines DiBlasi's interpretation. The rest of the document sets out the duties solely owed by DiBlasi.[102] Given that the "main function" summarizes the contents of the "position description," it is not reasonable to interpret it as imposing duties on the hospital when such duties are not specified anywhere else in the position description document.[103]

---

[100] *See Vaughn v. Didizian*, 648 A.2d 38, 40 (Pa. Super. Ct. 1994) ("The intent of the parties must be sought from a reading of the entire instrument.").

[101] Doc. 1-2 at 2.

[102] The subsequent headings set out "education" requirements, "essential functions" of the residency, "Clinical Learning Environment Review Responsibilities" of the resident, supervision and competency requirements for certain medical procedures, the resident's call duties, and required educational activities. Doc. 12-4.

[103] *See* RESTATEMENT (SECOND) CONTRACTS § 203(c) (1981) ("specific terms and exact terms are given greater weight than general language"); *Zoological Soc'y v. INTECH Constr., Inc.*, 48 Pa. D. & C. 4th 542, 550 (Pa. C.P. May 16, 2000) ("Where specific or exact terms appear to conflict with broader or more general terms, the former is more likely to express the meaning of the parties with respect to the situation than the general language.") (citing *PBS Coal v. Hardhat Mining*, 632 A.2d 903 (Pa. Super. Ct. 1993)).

"[T]he hospital's policies, procedures and regulatory requirements" described in the "Main Function" of the "Position Description" regulate only the "Family Medicine Residents'" "participation" in specified "activities" relating to their day-to-day patient care and educational functions. It is a one-way obligation unrelated to the transfer application process. Therefore, the Hospital Policy is not incorporated into the Agreement, as the cited language in "Exhibit A" to the Agreement only requires that DiBlasi herself abide by ACGME and Hospital procedures while engaging in patient care and educational activities. Accordingly, DiBlasi has failed to state a breach of contract claim as a matter of law, and her claim is therefore dismissed with prejudice.

## III.   CONCLUSION

Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted as to Counts IX and X of the complaint and denied as to all other counts.  Leave to amend is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[104]  A complaint is "futile" if even, as amended, it would fail to state a claim upon which relief could be granted.[105] Although there is a "liberal pleading philosophy of the federal rules" no

---

[104] *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).
[105] *Id.*

amendment will be permitted because another opportunity to plead a case would be futile.[106]

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[106] *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).