**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CLAUDIA R. DIBLASI, DO, | |
| Plaintiff, | CIVIL ACTION NO. 4:23-CV-1136 |
| v. | (MEHALCHICK, J.) |
| GUTHRIE/ROBERT PACKER HOSPITAL, et al., | |
| Defendants. | |

**<u>MEMORANDUM</u>**

Plaintiff Dr. Claudia R. DiBlasi, DO ("DiBlasi") initiated this action by filing a complaint on July 7, 2023, against Defendants Guthrie/Robert Packer Hospital ("Robert Packer Hospital") and Guthrie Medical Group, P.C. ("Guthrie") (together, "Defendants"). (Doc. 1). Before the Court is Defendants' motion for summary judgment. (Doc. 24). For the reasons provided herein, Defendants' motion will be **GRANTED.** (Doc. 24).

I.    **BACKGROUND AND PROCEDURAL HISTORY**

The following background is taken from the parties' statements of material facts and responses thereto.[1] (Doc. 25; Doc. 31). DiBlasi is a Doctor of Osteopathic Medicine who earned her doctorate from the Touro College of Osteopathic Medicine in Middletown, New York in 2019. (Doc. 25, ¶ 23; Doc. 31, at 16). Guthrie is a regional healthcare provider which owns Robert Packer Hospital, a teaching hospital in Sayre, Pennsylvania. (Doc. 25, ¶ 24; Doc.

---

[1] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. The facts have been taken in the light most favorable to the non-moving party with respect to the motion.

31, at 16). Guthrie offers several medical residency programs at Robert Packer Hospital which allow medical school graduates to train in specific medical specialties and practice areas. (Doc. 25, ¶¶ 25-26; Doc. 31, 16-17). The parties agree that Guthrie did not offer an anesthesiology residency program in 2019. (Doc. 25, ¶ 54; Doc. 31, at 22).

The parties generally agree that applicants to medical residency programs typically apply to residencies through the National Resident Matching Program ("NRMP") in which applicants submit their applications through the NRMP, residency program directors interview applicants, program directors rank the candidates they interviewed, candidates rank the residency programs they applied for, and the NRMP matches candidates with programs. (Doc. 25, ¶¶ 30-34; Doc. 31, at 17). DiBlasi asserts that newly established residency programs do not use the NRMP and instead, applicants contact program directors to apply directly to the programs. (Doc. 31, at 17). If a residency program does not fill all available positions after the NMRP concludes, it may interview individuals who did not match with a residency program to fill its remaining positions. (Doc. 25, ¶ 36; Doc. 31, at 17). This process is known as the Supplemental Application Opportunity Program ("SOAP"). (Doc. 25, ¶ 36; Doc. 31, at 17).

Teaching hospitals receive federal funding for their residency programs from the Center for Medicare and Medicaid Services ("CMS"). (Doc. 25, ¶ 40, Doc. 31, at 18). These payments take the form of direct graduate medical education ("DGME") payments and indirect medical education ("IME") payments. (Doc. 25, ¶ 40, Doc. 31, at 18). The parties dispute how DGME payments are calculated. (Doc. 25, ¶¶ 41-49; Doc. 31, at 18-21). According to Defendants, DGME funding is determined by a formula which considers the number of full-time equivalent ("FTE") residents in a residency program with some FTE

2

residents being weighted more heavily than others. (Doc. 25, ¶¶ 41-44). Defendants assert that each type of residency program has a minimum set number of years it takes to complete the residency, and a resident who requires more years to complete their residency than the minimum number of years is weighted less heavily when calculating funding. (Doc. 25, ¶¶ 45-47). Defendants contend that if a resident transfers residency programs, the years they spent in their previous residency program count towards the total number of years they need to complete their new residency program. (Doc. 25, ¶¶ 45-49). If a resident completes one year of a residency and transfers into a residency program which requires three minimum years to complete, under the DGME funding formula that resident is weighted less heavily because they need four years to complete a three-year minimum residency. (Doc. 25, ¶¶ 45-49). Defendants conclude that because of this, residents transferring programs could result in teaching hospitals losing funding. (Doc. 25, ¶¶ 45-49). According to DiBlasi, Defendants oversimplify how DGME funding is calculated. (Doc. 31, at 18-21). DiBlasi asserts that DGME funding is not based on the time it will take individual residents to complete their residency, but rather a rolling average of all residents in all programs. (Doc. 31, at 19). DiBlasi contends that an individual resident requiring more than the minimum number of years to complete their residency would not lead to a teaching hospital losing funding. (Doc. 31, at 18-21).

In 2019, DiBlasi entered the NRMP but did not match with a residency. (Doc. 25, ¶¶ 50, 62; Doc. 31, at 22-23). After the 2019 NRMP concluded, Guthrie had an open position in its Family Medicine Residency Program which was operated by program director Dr. Donald Phykitt ("Phykitt"). (Doc. 25, ¶ 65; Doc. 31, at 23). DiBlasi applied and interviewed for a position in Guthrie's Family Medicine Residency Program during the 2019 SOAP process

and Defendants offered her a position which she accepted some time before July 1, 2019. (Doc. 25, ¶¶ 68, 70, 72; Doc. 31, at 23-24). DiBlasi notes that she was forty-nine years old at the time she began her residency. (Doc. 31, at 71).

In 2019, Guthrie decided to create an anesthesiology residency program. (Doc. 25, ¶¶ 107, 178-79; Doc. 31, at 28, 42). In the spring of 2019, Dr. Burdett Porter ("Porter"), Guthrie's Anesthesiology Residency Program's program director, began the process of obtaining accreditation for the program from the Accreditation Counsel for Graduate Medical Education ("ACGME"). (Doc. 25, ¶¶ 178-79; Doc. 31, at 42). When a teaching hospital opens a new residency program, the residency program participates in the NRMP if the program receives its accreditation within the time period in which residents match with programs, but if the new program receives its accreditation after the deadline for residency matches ends, the program director may hire the program's first complement of residents outside of the NRMP. (Doc. 25, ¶¶ 109-10, Doc. 31, at 29). A new program may also accept residents who transfer from another residency program and the ACGME requires programs to maintain certain policies regarding resident transfers. (Doc. 25, ¶¶ 111-12; Doc. 31, at 29).

In October 2019, DiBlasi exchanged emails with Porter regarding her interest in transferring into Guthrie's Anesthesiology Residency Program once it received accreditation. (Doc. 25, ¶¶ 181-82, Doc. 31, at 42). Porter discussed the financial implications of a Guthrie resident transferring programs with Dale Johnson ("Johnson"), Guthrie's Director of Medical Education/Associate Vice President for Medical Education. (Doc. 25, ¶ 186; Doc. 31, at 43). According to Defendants, Johnson provided Porter with background information as to what factors should be considered when accepting a transfer resident and informed Porter that Guthrie discouraged accepting transfers resident if doing so would reduce Robert Packer

4

Hospital's funding. (Doc. 25, ¶¶ 187-88). Defendants also assert that Porter believes that residents will not receive CMS funding for any years of training beyond the minimum number of years it takes to complete their residency. (Doc. 25, ¶ 189). DiBlasi asserts that there is no evidence Johnson provided Porter with this background information or that Johnson was involved in vetting and approving resident transfers. (Doc. 31, at 43-44).

In 2019, Porter began to attend biweekly meetings with Guthrie administrators to discuss the formation and accreditation of Guthrie's Anesthesiology Residency Program. (Doc. 25, ¶¶ 190-92; Doc. 31, at 45). According to Defendants, Guthrie administrators informed Porter at an October 9, 2019, bi-weekly meeting that Guthrie's Anesthesiology Residency Program would not be allowed to accept transfers of "categorical residents" who had already completed at least a year of another Guthrie residency program due to funding concerns. (Doc. 25, ¶¶ 193-194). DiBlasi asserts Guthrie administrators told Porter that he could not accept transfer residents from Guthrie's Family Medicine Residency Program or accept DiBlasi specifically based on the false premise that Robert Packer Hospital could lose funding by allowing residents to transfer. (Doc. 31, at 45-46). On October 10, 2019, Porter emailed DiBlasi to inform her that Guthrie administrators told him that Guthrie's Anesthesiology Residency Program will not be allowed to accept transfers of categorical residents because Defendants had lost federal funding due to residents from Guthrie's Family Medicine Residency Program transferring into Guthrie's Emergency Medicine Residency Program. (Doc. 25, ¶ 195; Doc. 31, at 46).

In spring 2020, the ACGME provided Guthrie's Anesthesiology Residency Program with accreditation a year ahead of schedule and because of the timing of accreditation, the program's first complement of residents was hired outside of the NRMP. (Doc. 25, ¶¶ 203-04;

Doc. 31, at 46-57). On May 5, 2020, DiBlasi emailed Porter to ask whether he was looking for residents for Guthrie's Anesthesiology Residency Program, and Porter informed DiBlasi that she would not be eligible for the program because her funding "would cease" after her third year as a resident. (Doc. 25, ¶¶ 205-08; Doc. 31, at 47). Porter accepted the Anesthesiology Residency Program's first complement of residents outside of the NRMP and none of these residents were transfer residents from another Guthrie residency program. (Doc. 25, ¶¶ 213-15; Doc. 31, at 49). Porter has never accepted a resident who transferred from a Guthrie residency program. (Doc. 25, ¶¶ 216-19; Doc. 31, at 49-50). However, other Guthrie residency programs have accepted residents who transferred from Guthrie's Family Medicine Residency Program. (Doc. 25, ¶¶ 174-76, Doc. 31, at 41-42). Guthrie's Orthopedic Surgery Residency Program accepted Dr. William Wardell ("Wardell") as a transfer resident after he had completed two years of Guthrie's Family Medicine Residency Program and DiBlasi learned of Wardell's transfer in July 2021. (Doc. 25, ¶¶ 163, 174-77; Doc. 31, at 38, at 41-42).

Guthrie's Anesthesiology Residency Program never accepted DiBlasi and DiBlasi progressed through Guthrie's Family Medicine Residency Program. (Doc. 25, ¶¶ 101-106; Doc. 31, at 28). DiBlasi's third and final year of her residency was scheduled to run from July 1, 2021, to June 30, 2022, however, DiBlasi took a leave of absence during this period due to a surgery on her Achilles tendon, and she returned to work on March 2, 2023. (Doc. 25, ¶¶ 101-106; Doc. 31, at 28). DiBlasi graduated from Guthrie's Family Medicine Residency Program on April 10, 2023. (Doc. 25, ¶¶ 101-106; Doc. 31, at 28).

DiBlasi asserts that throughout her tenure in Guthrie's Family Medicine Residency Program other residents, her supervisors, and residency leadership mistreated her due to her age and gender. (Doc. 31, at 59-68, 71-72, 80-82). According to DiBlasi, other residents

regularly disrespected her due to her age and gender and provides examples of two instances in 2019 and 2020 where a senior resident, Dr. Rozita Sabet-Rasekh ("Sabet-Rasekh"), made a comment about how it is difficult to learn after a certain age. (Doc. 31, at 59-61). Defendants contest DiBlasi's claim that other residents regularly mistreated her and asserts that Sabet-Rasekh does not recall making these comments. (Doc. 25, ¶¶ 254-59). DiBlasi also contends that throughout her tenure, residency supervisors and leadership treated her differently than younger male residents including by having her peers supervise her and requiring her to complete additional assignments, rotations, and certifications which younger male residents were not required to complete. (Doc. 31, at 72, 80-82). Defendants aver that there is no evidence in the record that DiBlasi was treated differently due to her age or gender and that DiBlasi never reported discrimination during her residency. (Doc. 25, ¶¶ 254-66, 275-78).

DiBlasi also asserts that she has attention deficit disorder ("ADD") and throughout her residency, Defendants refused to accommodate her ADD. (Doc. 31, at 76). Both parties agree that on April 11, 2020, DiBlasi informed Phykitt, her residency's program director, and Kierstin Gardner ("Gardner"), an administrative employee, that she had ADD but that she was not requesting any accommodations at that time. (Doc. 25, ¶¶ 233-38; Doc. 31, at 54-55). DiBlasi asserts that she later requested to be excused from attending mandatory lunch lectures which DiBlasi avers was a request for accommodations. (Doc. 31, at 56-57). DiBlasi further asserts that Defendants deceived her into undergoing a neuropsychiatric evaluation with Dr. Terry Donner ("Donner") which Defendants arranged to verify if DiBlasi "actually had ADD." (Doc. 31, at 76). Defendants counter that DiBlasi never requested accommodations for her ADD and explicitly told Phykitt that she did not need any accommodations in an April 15, 2020, email. (Doc. 25, ¶¶ 232-41). Defendants also contend that Guthrie's Family

7

Residency Program Clinical Competency Committee ("CCC"), which evaluates resident performance and makes recommendations regarding the progression of residents through the program, recommended DiBlasi undergo a learning evaluation with Donner due to concerns with her performance. (Doc. 25, ¶¶ 79-87). Defendants further assert that the CCC communicated this recommendation with DiBlasi in March 2020, the CCC recommended other residents complete learning evaluations, and the CCC did not require DiBlasi to undergo the learning evaluation. (Doc. 25, ¶¶ 88-93).

In April 2022, DiBlasi dual-filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC"). (Doc. 25, ¶ 1; Doc. 31, at 11). Defendants assert that DiBlasi filed the charge on April 19, 2022, and DiBlasi asserts it was filed on April 22, 2022. (Doc. 25, ¶ 1; Doc. 31, at 11). Defendants received a notice of this charge on July 26, 2022. (Doc. 25, ¶ 265; Doc. 31, at 63). DiBlasi asserts that after she filed her charge, Defendants retaliated against her by denying her access to facilities, allowing her licensing to expire, delaying her licensing, requiring her to finish her residency requirements by means of telehealth visits, denying her the opportunity to recertify her ALS and BLS qualifications, denying her the ability to be certified to perform paracentesis, failing to increase her hours to full-time service, denying her access to residency records, and not allowing her to attend a graduation ceremony. (Doc. 31, at 63-65, 89-91). Defendants deny that they took any of these retaliatory actions. (Doc. 25, ¶¶ 265-72).

DiBlasi filed the complaint in this matter on July 7, 2023, alleging eight counts under state and federal law.[2] (Doc. 1). Count I alleges that Defendants violated the Pennsylvania Human Rights Act ("PHRA") by discriminating against DiBlasi on the basis of her disability and subjecting her to a hostile work environment. (Doc. 1, ¶¶ 58-85). Count II alleges Defendants violated the Age Discrimination in Employment Act ("ADEA") by discriminating against DiBlasi on the basis of her age and subjecting her to a hostile work environment. (Doc. 1, ¶¶ 86-113). Count III alleges Defendants violated the PHRA by discriminating against DiBlasi on the basis of her age and subjecting her to a hostile work environment. (Doc. 1, ¶¶ 114-43). Count IV alleges that Defendants violated Title VII by discriminating against DiBlasi on the basis of her gender and subjecting her to a hostile work environment.[3] (Doc. 1, ¶¶ 144-54). Count V alleges Defendants violated the PHRA by discriminating against DiBlasi on the basis of her gender and subjecting her to a hostile work environment. (Doc. 1, ¶¶ 155-67). Counts VI, VII, and VIII allege Defendants violated the

---

[2] The complaint originally contained ten counts. (Doc. 1). However, on November 22, 2023, this Court dismissed Counts IX and X. (Doc. 15).

[3] The Court notes that Counts II and IV do not clearly indicate that they are alleging hostile work environment claims. (Doc. 1, ¶¶ 86-113, 144-54). However, DiBlasi argues that all of her age and gender discrimination claims are part of hostile work environment claims. (Doc. 32, at 13-14, 21-27). Count II and IV both incorporate all previous averments in the complaint, which includes allegations that DiBlasi was subjected to a hostile work environment and the allegations which make up DiBlasi's hostile work environment claims. (Doc. 1, ¶¶ 86, 144). Accordingly, for purposes of the instant motion, the Court will interpret Counts II and IV to include hostile work environment claims. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (finding a complaint does not need to have a perfect "statement of the legal theory supporting the claim asserted"); *see also Gardner v. State of Delaware Dep't of Health & Soc. Servs.*, 159 F. Supp. 3d 473, 476 (D. Del. 2016) (finding the same).

ADEA, Title VII, and the PHRA by retaliating against DiBlasi after she filed an administrative charge. (Doc. 1, ¶¶ 168-82).

On November 4, 2024, Defendants filed a motion for summary judgment along with a statement of facts and corresponding exhibits. (Doc. 24; Doc. 25; Doc. 26). On November 18, 2024, Defendants filed a brief in support. (Doc. 30). On December 9, 2024, DiBlasi filed a brief in opposition and answer to statement of facts. (Doc. 31; Doc. 32). On December 23, 2024, Defendants filed a reply brief. (Doc. 35). On February 4, 2025, DiBlasi filed a motion for leave to file a supplemental brief in opposition which the Court granted on June 25, 2025. (Doc. 37; Doc. 42). On June 25, 2025, DiBlasi filed a supplemental brief in opposition. (Doc. 43). On July 9, 2025, Defendants filed a reply brief to DiBlasi's supplemental brief in opposition. (Doc. 44). Accordingly, the motion for summary judgment is now ripe for disposition.

## II.   MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). However, a party opposing a summary judgment motion must comply with Local Rule

56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." *See* M.D. Pa. L.R. 56.1.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must go beyond the pleadings with affidavits or declarations, answers to interrogatories, or the like to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. The non-movant must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Furthermore, mere conclusory allegations and self-serving testimony, whether made in

the complaint or a sworn statement, cannot be used to obtain or avoid summary judgment when uncorroborated and contradicted by other evidence of record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *see also Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (not precedential) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."); *Nat'l Labor Rel. Bd. v. FES*, 301 F.3d 83, 95 (3d Cir. 2002) ("[The plaintiff's] testimony. . . amounts to an unsupported, conclusory assertion, which we have held is inadequate to satisfy the movant's burden of proof on summary judgment").

## III.    DISCUSSION

Defendants move for summary judgment on three bases. (Doc. 30). First, Defendants aver that DiBlasi failed to exhaust her administrative remedies for all her claims because she did not file an administrative complaint within 300 days of any alleged discriminatory or retaliatory acts. (Doc. 30, at 12-18). Next, DiBlasi avers that even if the Court finds that DiBlasi exhausted her administrative remedies, the court should grant summary judgment on Counts II, IV, VI, an VII because DiBlasi failed to file a complaint within 90-days of receiving her right to sue letter from the EEOC. (Doc. 30, at 19-21). Finally, Defendants conclude that even if DiBlasi's claims are not barred by her failure to exhaust administrative remedies or file a timely complaint, she fails to established a *prima facie* case for discrimination, a hostile work environment, or retaliation. (Doc. 30, at 22-49). The Court will address each issue in turn.

A.    DIBLASI FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES FOR HER DIRECT DISCRIMINATION CLAIMS BUT EXHAUSTED HER ADMINISTRATIVE REMEDIES FOR HER RETALIATION CLAIMS AND SOME OF HER HOSTILE WORK ENVIRONMENT CLAIMS.

Defendants make two exhaustion of administrative remedies arguments. (Doc. 30, at 12-17). First, Defendants posit that DiBlasi failed to exhaust her administrative remedies for Counts I, II, III, IV, and V, DiBlasi's discrimination and hostile work environment claims, because she did not file an administrative charge within 300 days of any alleged discriminatory act. (Doc. 30, at 12-14). Second, Defendants aver that DiBlasi failed to exhaust her administrative remedies for Counts VI, VII, and VII, DiBlasi's retaliation claims, because she did not file an administrative charge alleging retaliation. (Doc. 30, at 14-17). The Court will address each issue in turn.

> **1. DiBlasi failed to file a timely administrative charge regarding her discrimination claims but filed a timely administrative charge regarding some of her hostile work environment claims.**

Counts I, II, III, IV, and V allege discrimination on the basis of age, gender, and disability. (Doc. 1, ¶¶ 58-167). Each of these claims allege Defendants discriminated against DiBlasi by denying her requests to transfer from Guthrie's Family Medicine Residency Program to Guthrie's Anesthesiology Residency Program.[4] (Doc. 1, ¶¶ 58-167). Each of these

---

[4] The Courts notes that the complaint alleges Defendants discriminated against Plaintiff by treating DiBlasi less favorably than younger male employees "in terms of job assignments, promotions, training opportunities and/or other benefits" in violation of the ADEA, Title VII, and the PHRA. (Doc. 1, ¶¶ 109, 137, 150, 161). DiBlasi only defends her discrimination claims as they relate to Defendants denying her request to transfer residencies. (Doc. 32, at 16-21). Defendants aver that DiBlasi has fails to establish a *prima facie* case of discrimination, and DiBlasi only provides arguments and evidence regarding her *prima facie* case of discrimination as it relates to Defendants denying her transfer requests. (Doc. 30, at 22-35; Doc. 32, at 16-21). To survive a summary judgment, an ADEA, Title VII, or PHRA plaintiff "must establish a *prima facie* case of discrimination." *Parikh v. UPS, 491* F. App'x 303, 307 (3d Cir. 2012) (nonprecedential); *see also Paradoa v. Philadelphia Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015). To establish a *prima facie* case, a plaintiff must present argument and evidence from which a reasonable jury may infer that the plaintiff suffered an adverse action. *See Parikh, 491* F. App'x at 307; *see also Paradoa.* 610 F. App'x at 166. DiBlasi only presents arguments and evidence that her denial of transfer was an adverse action. (Doc. 32, at 16-21).

claims also allege Defendants discriminated against DiBlasi by subjecting her to a hostile work environment throughout her residency.[5] (Doc. 1, ¶¶ 58-167). Defendants aver that DiBlasi failed to exhaust her administrative remedies for these claims because she did not file an administrative charge within 300 days of any alleged illegal act. (Doc. 30, at 12-18).

"[A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file [an administrative] charge within the appropriate time period—180 or 300 days—set forth in 42 U.S.C. § 2000e–5(e)(1)." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002). Similarly, the ADEA requires plaintiffs to first file an administrative charge either 180 or 300 days after an "alleged unlawful practice occurred" depending on the state where the unlawful practice took place. 29 U.S.C.A. § 626 (d). Pennsylvania is a "deferral state" in which Title VII and ADEA plaintiffs have 300 days to file an administrative charge.[6] *See Seredinski v.*

---

Further, as discussed *infra* Section III.A.1.c, DiBlasi avers that her allegations that other residents, supervisors, and residency leadership mistreated her constitute a hostile work environment claim. The component acts of a hostile work environment claim cannot be discrete, separately actionable acts. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013). Because of this, the Court will consider DiBlasi's discrimination claims to be based on Defendants denying her transfer requests and her remaining allegations to relate to her hostile work environment claims.

[5] Although Count I alleges that DiBlasi was discriminated against on the basis of her disability when she was denied the opportunity to transfer programs, made to attend an evaluation with Donner, and denied accommodations, DiBlasi states in her brief in opposition that "Dr. DiBlasi's claims concerning disability[-]based discrimination are part of her hostile work environment claim." (Doc. 32, at 17). Accordingly, the Court will only consider Count I to be a hostile work environment claim.

[6] "To file suit under the PHRA, a plaintiff must first file an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." *Ellingsworth v. Hartford Fire Ins. Co.*, 247 F. Supp. 3d 546, 558 (E.D. Pa. 2017). Courts generally apply the same exhaustion of administrative remedies analysis when analyzing both federal and PHRA discrimination claims. *See Hills v. Borough of Colwyn*, 978 F. Supp. 2d 469, 479 (E.D. Pa. 2013); *see also Wilson v. Ciocca Muncy Ho Inc.*, No. 4:23-CV-00765, 2023 WL 6449425, at *4 (M.D.

*Clifton Precision Prods. Co., Div., of Litton Sys.*, 776 F.2d 56, 61 (3d Cir. 1985). This 300-day time limit is treated as a statute of limitations and courts apply statute of limitations doctrines such as equitable tolling to determine whether an administrative charge is timely. *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001); *see also Koller v. Abington Mem'l Hosp.*, 251 F. Supp. 3d 861, 864 (E.D. Pa. 2017). Further, the Supreme Court has held that "[a] charge alleging a hostile work environment claim. . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 122.

The parties agree that unless a doctrine which extends the statute of limitations applies, claims based on incidents which occurred before June 26, 2021, are unexhausted because that date is the "lookback date" 300 days before DiBlasi filed her administrative complaint. (Doc. 32, at 10; Doc. 35, at 8). Defendants aver that DiBlasi's discrimination and hostile work environment claims relate entirely to acts which occurred before June 26, 2021, and are thus unexhausted. (Doc. 30, at 12-14; Doc. 35, at 8-9). DiBlasi argues that her discrimination claims are exhausted because even though Defendants denied her transfer requests in 2019 and 2020, she did not discover that she was discriminated against until July 2021 and Defendants actively misled her regarding her denial of transfer until July 2021. (Doc. 32, at 10-14). DiBlasi also argues that all the discrimination she faced, including Defendants denying her transfer requests, are part of her hostile work environment claims and her hostile work environment claims are exhausted because at least one component act of discrimination

Pa. Oct. 3, 2023). Because a charge not brought within 300 days of an illegal act would also not be brought within 180 days of an illegal act, the Court will consider DiBlasi's PHRA claims under the same analysis as her Title VII and ADEA claims.

which make up her claims occurred after June 26, 2021. (Doc. 32, at 10-14). The Court will address each of DiBlasi's theories in turn.

a.  <u>The discovery rule does not apply to DiBlasi's claims.</u>

DiBlasi attempts to apply the discovery rule by arguing that her administrative charge was timely because she did not discover Defendants discriminated against her when denying her transfer requests until July 2021. (Doc. 32, at 10-14). "[T]he discovery rule 'tolls the limitations period until the plaintiff learns of his cause of action or with reasonable diligence could have done so.'" *Stephens v. Clash*, 796 F.3d 281, 284 (3d Cir. 2015) (quoting *William A. Graham Co. v. Haughey*, 646 F.3d 138, 141 (3d Cir. 2011). Courts must look to statutory language to determine if the discovery rule applies to a claim brought under a given statute. *Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018), *aff'd*, 589 U.S. 8 (2019). The discovery rule does not apply if a claim is brought under a statute which states the statute of limitation "begin[s] to run when a violation 'occurs [or occurred].'" *Rotkiske*, 890 F.3d at 428. Both Title VII and the ADEA require a plaintiff to file an administrative complaint either 180 or 300 days after the alleged violation "occurred." 42 U.S.C.A. § 2000e-5 (e)(1); 29 U.S.C.A. § 626 (d). The PHRA states a plaintiff must file an administrative charge "within one hundred eighty days after the alleged act of discrimination." 43 Pa. Stat. Ann. § 959 (h). Courts have interpreted the above language to mean that the discovery rule does not apply to Title VII, ADEA, and PHRA discrimination claims. *See Rotkiske*, 890 F.3d at 428 (finding that the discovery rule cannot apply to Title VII claims due to the statute's use of the word "occurred"); *see also Bytner v. Allegheny Cnty. Jail*, No. 2:17-CV-01675, 2018 WL 4407837, at *4 (W.D. Pa. Sept. 17, 2018) (finding the discovery rule does not apply to Title VII and ADEA claims); *see also Gardner v. SEPTA*, No. CV 20-6045, 2022 WL 17558720, at *5 (E.D. Pa. Dec.

16

9, 2022), *aff'd sub nom. Gardner v. Se. Pennsylvania Transportation Auth.*, No. 22-3447, 2024 WL 637466 (3d Cir. Feb. 15, 2024) (finding the discovery rule does not apply to Title VII and PHRA claims); *see also Goodman v. Norristown Area Sch. Dist.*, No. CV 20-1682, 2020 WL 5292051, at *3 (E.D. Pa. Sept. 4, 2020) (same).

Here, DiBlasi argues that she filed a timely administrative charge relating to Defendants denying her transfer request because she did not discover she was discriminated against until July 2021 when she learned Defendants allowed Wardell residencies. (Doc. 32, at 10-11). Because the discovery rule does not apply to DiBlasi's claims, this argument fails. *See Rotkiske*, 890 F.3d at 428; *see also Bytner*, 2018 WL 4407837, at *4; *see also Gardner*, 2022 WL 17558720, at *5; *see also Goodman*, 2020 WL 5292051, at *3. Thus, the Court must turn to DiBlasi's next theory of exhaustion.

b.  Equitable tolling does not apply to DiBlasi's claims.

DiBlasi argues that her discrimination claims are exhausted because Defendants actively misled her regarding the reasons they denied her transfer requests and as such, she is entitled to equitable tolling. (Doc. 32, at 12-13). "Under equitable tolling, plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999). The Third Circuit has "exercised caution in using the doctrine [of equitable tolling]." *Seitzinger*, 165 F.3d at 240. "'[R]estrictions on equitable tolling. . . must be scrupulously observed,' as this remedy is 'available only sparingly and in extraordinary situations.' Plaintiffs bear the burden of establishing the facts necessary to justify an extension." *Koller*, 251 F. Supp. 3d at 865.

In the context of employment discrimination cases, equitable tolling applies where "it appears that (1) the defendant actively misled the plaintiff respecting the reason for [an adverse action], and (2) this deception caused the plaintiff's non-compliance with the limitations provision." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994); *see also Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007). Regarding the first requirement, "[a] defendant actively misleads the plaintiff when the defendant's 'own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights,' but the acts or omissions need not be 'egregious acts of active deception." *Johnson v. Fed. Exp. Corp.*, 996 F. Supp. 2d 302, 315 (M.D. Pa. 2014), *aff'd*, 604 F. App'x 183 (3d Cir. 2015) (quoting *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 845 (3d Cir. 1992)). A plaintiff must present evidence from which a reasonable jury may infer that the defendant took steps beyond mere silence to mislead the plaintiff. *Johnson*, 996 F. Supp. 2d at 315. To meet the second requirement, the plaintiff must "demonstrate that he or she could not, by the exercise of reasonable diligence, have discovered essential information bearing on his or her claim.'" *Ruehl*, 500 F.3d at 384 (quoting *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004)). "[E]quitable tolling is not an excuse for ignorance; a plaintiff must show that he or she could not have discovered the essential information bearing on the claim by the exercise of reasonable diligence." *Johnson*, 996 F. Supp. 2d at 315. A plaintiff must present evidence from which a reasonable jury may infer that the plaintiff could not have uncovered the nature of their discrimination by investigating their employer's policies due to extraordinary circumstances. *See Johnson*, 996 F. Supp. 2d at 315

The Court finds that DiBlasi fails to present evidence from which a reasonable jury may infer that extraordinary circumstances prevented her from uncovering the discriminatory

nature of Defendants denying her transfer requests. DiBlasi avers that Defendants actively misled her as to the real reason why they denied her transfer requests when Porter falsely claimed Guthrie's Anesthesiology Residency Program could not accept transfer residents due to funding concerns. (Doc. 32, at 11-13). DiBlasi further contends that she could not have learned that the reasons Porter told her that she was not permitted to transfer were fabricated until July 2021 when she learned Wardell was allowed to transfer programs. (Doc. 32, at 12). Even if the Court accepts as true that a reasonable jury could infer that Defendants misled DiBlasi regarding the real reasons they denied her transfer requests, DiBlasi fails to provide any reasons or evidence for why "[she] could not have discovered the essential information bearing on the claim by the exercise of reasonable diligence" or by looking at Defendants' policies on transferring residencies. *Johnson*, 996 F. Supp. 2d at 315. DiBlasi's complaint cites Guthrie policies that were in effect as of September 2019 as evidence that Defendants' reasons for denying her transfer requests were fabrications but presents no reason as to why she could not look at these same policies prior to June 26, 2021. (Doc. 1, ¶¶ 95-96). Accordingly, DiBlasi fails to meet her burden to present evidence from which a reasonable jury may infer that Defendants' alleged deception created extraordinary circumstances which caused her late filing. *See Koller*, 251 F. Supp. 3d at 866; *see also Johnson*, 996 F. Supp. 2d at 315. Equitable tolling cannot extend the period DiBlasi had to file a charge related to Defendants denying her transfer request. The Court thus turns to DiBlasi's final exhaustion argument regarding her discrimination and hostile work environment claims.

c.  DiBlasi's hostile work environment claims are partially exhausted.

DiBlasi avers that all her discrimination and hostile work environment claims are exhausted because all her allegations of discrimination and mistreatment collectively

19

contribute to her hostile work environment claims and hostile work environment claims are timely where one of the acts which make up the claims occurred within 300 days of the plaintiff filing an administrative charge. (Doc. 32, at 10-14). According to DiBlasi, the following allegations create her hostile work environment claims: 1) Defendants denied DiBlasi's transfer requests, 2) after DiBlasi disclosed she had ADD, Defendants deceived her into taking a neuropsychiatric evaluation and denied her accommodations requests, 3) DiBlasi was mistreated by other residents, supervisors, and residency leadership due to her age and gender, and 4) residency leadership and supervisors held DiBlasi to different standards than other residents and did not take her various concerns seriously. (Doc. 32, at 10-14, 16, 23-25). Defendants aver DiBlasi's claims are made up of separately actionable discrete actions that cannot be combined into a hostile work environment claim. (Doc. 35, at 18-20).

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117. "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment [claim]." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 118. However, "[h]ostile [work] environment claims are different in kind from discrete acts." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. A plaintiff may not extend the time in which they have to file an administrative charge if the alleged illegal acts are "discrete acts" which constitute "separate actionable unlawful employment practice[s]." *Mandel*, 706 F.3d at 165. "Discrete acts include, for example, 'termination, failure to promote, denial of transfer, or refusal to hire.'" *Mandel*, 706 F.3d at 165 (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114). A defendant denying disability accommodations is also a discrete act.

*See Mercer v. SEPTA*, 608 F. App'x 60, 63 (3d Cir. 2015) (nonprecedential); *see also Emmell v. Phoenixville Hosp. Co., LLC*, 303 F. Supp. 3d 314, 326 (E.D. Pa. 2018). Discrete acts cannot be aggregated into a hostile work environment claim to extend the time a plaintiff has to file their administrative charge. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006); *see also Doe v. Mercy Cath. Med. Ctr.,* 850 F.3d 545, 566 (3d Cir. 2017); *see also Fields v. Am. Airlines, Inc.*, 696 F. Supp. 3d 66, 111 (E.D. Pa. 2023), *aff'd*, No. 23-2962, 2024 WL 3534478 (3d Cir. July 25, 2024).

Here, DiBlasi argues her claims related to Defendants denying her transfer requests are exhausted as part of her hostile work environment claims. (Doc. 32, at 13-14). However, denial of transfer is a discrete act which is independently actionable. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114; *see also Mandel*, 706 F.3d at 165. DiBlasi herself avers that she has established a *prima facie* case of discrimination regarding Defendants denying her transfer requests. (Doc. 32, at 18-21). Accordingly, DiBlasi's claims relating to defendants denying her transfer requests cannot be congregated with other acts in a hostile work environment claim to extend the time DiBlasi had to file an administrative charge.[7] *See Doe,* 850 F.3d at 566; *Fields*, 696 F. Supp. 3d at 111.

DiBlasi further contends that the Court should consider incidents from 2020 where DiBlasi disclosed she had ADD to Defendants, Defendants allegedly deceived DiBlasi into

---

[7] DiBlasi implies that the Defendants allowing other residents to transfer residencies were also component acts in her hostile work environment claim. (Doc. 32, at 13). This argument fails because a discrimination claim accrues when an individual suffers an adverse action, not when others are treated more favorably. *See Hanani v. State of New Jersey Dep't of Env't Prot.*, 205 F. App'x 71, 78 (3d Cir. 2006) (rejecting a plaintiff's argument that the defendant offering another employee a promotion that the plaintiff was allegedly discriminatorily denied created a new cause of action or extended the statute of limitations).

taking a neuropsychiatric evaluation to verify if she had ADD, and Defendants allegedly denied DiBlasi's reasonable accommodations requests as part of her hostile work environment claims.[8] (Doc. 31, at 54-57, 76; Doc. 31-11, at 446-47; Doc. 32, at 16). Like with her denial of transfer claims, DiBlasi cannot aggregate her disability claims into her hostile work environment claims because her disability claims relate to denial of accommodations which is a discrete act. *See Mercer*, 608 F. App'x at 63; *see also Emmell*, 303 F. Supp. 3d at 326.

The remaining components of DiBlasi's hostile work environment claims involve more general allegations of other residents, DiBlasi's supervisors, and residency leaderships mistreating DiBlasi based on her age and gender. (Doc. 32, at 13-14, 22-25). DiBlasi cites her own testimony that other residents, her supervisors, and residency leadership treated her differently than younger male residents as evidence that she was subjected to a hostile work environment. (Doc. 31-11, at 20, 43; Doc. 32, at 23-25). DiBlasi also presents a document she previously provided the EEOC which lists various incidents where other residents, supervisors, and residency leadership disrespected DiBlasi. (Doc. 31-11, at 440-61; Doc. 32, at 26). The incidents listed include incidents where other residents would not cooperate with DiBlasi during group tasks, residency supervisors would disparage DiBlasi behind her back,

---

[8] The Court notes that DiBlasi is unclear as to when she requested accommodations, but DiBlasi's complaint and EEOC filings claim that the purpose of the 2020 neuropsychiatric evaluation was to verify if DiBlasi was being truthful about her ADD and the evaluation's findings resulted in Defendants denying DiBlasi's accommodations requests. (Doc. 1, ¶¶ 68-76; Doc. 31-11, at 447). When a defendant challenges the timeliness of an accommodations claim in a motion for summary judgment, a plaintiff must provide evidence of denials of accommodations which occurred after the relevant lookback date. *See Mercer*, 608 F. App'x at 63; *see also Wright*, 2023 WL 2589226, at *7. Because the only evidence in the record regarding when DiBlasi requested accommodations indicates Defendants denied DiBlasi's requests in 2020, the Court will assume DiBlasi requested accommodations before June 26, 2021. (Doc. 31-11, at 447).

and more junior residents would not respect DiBlasi's seniority. (Doc. 31-11, at 440-61). This document also alleges that DiBlasi's supervisors and residency leadership held DiBlasi to different standards than other residents, required her to complete different graduation requirements than other residents, imposed administrative burdens not imposed on other residents, and did not take various concerns raised by DiBlasi seriously. (Doc. 31-11, at 440-61). Some of the incidents discussed in this document, such as an incident where Phykitt required DiBlasi to reobtain a certification she already obtained, occurred after June 26, 2021. (Doc. 31-11, at 453-60; Doc. 32, at 14). DiBlasi's testimony and list aggregate minor incidents that can be combined into a hostile work environment claim because the incidents are not independently actionable, discrete acts. *See Doe,* 850 F.3d at 566; *see also Fields,* 696 F. Supp. 3d at 111. Thus, DiBlasi's administrative charge regarding these minor acts was timely and she exhausted her administrative remedies for her hostile work environment claims as they relate to these non-discrete acts. *See Nat'l R.R. Passenger Corp.,* 536 U.S. at 115

In sum, the Court finds that DiBlasi failed to exhaust her administrative remedies for claims relating to Defendants denying DiBlasi's request to transfer residencies, Defendants denying DiBlasi reasonable accommodations, and Defendants deceiving DiBlasi into undergoing a neuropsychiatric evaluation. Defendants' motion for summary judgment on Counts I, II, III, IV, and V is **GRANTED** as it relates to those claims. (Doc. 24). However, the Court finds that DiBlasi's remaining hostile work environment claims in Counts I, II, III, IV, and V are exhausted, and the Court will consider the merits of those claims. (Doc. 1, ¶¶ 58-167).

### 2. DiBlasi's retaliation claims are exhausted.

Counts VI, VII, and VIII allege that Defendants violated the ADEA, Title VII, and the PHRA by retaliating against DiBlasi after she filed an administrative charge. (Doc. 1, ¶¶ 168-82). Defendants aver that DiBlasi failed to exhaust her administrative remedies regarding her retaliation claims because she never filed any administrative charges listing retaliation as a potential cause of action. (Doc. 30, at 15). DiBlasi avers that she was not required to file an administrative charge listing retaliation as a cause of action because "the retaliation that Dr. DiBlasi has alleged arose directly from her original PHRC/EEOC complaint" and an administrative charge is not required in such circumstances. (Doc. 32, at 27-28).

The ADEA, Title VII, and the PHRA all require plaintiffs exhaust their administrative remedies by filing an administrative complaint prior to filing suit. *See* 29 U.S.C.A. § 626 (d)(1); *see also* 42 U.S.C.A. § 2000e-5 (f)(1); *see also* 43 Pa. Stat. Ann. § 959. However, a plaintiff may bring claims based on retaliation which occurred subsequently to the filing of the administrative charge without filing an additional charge so long as the incident "1) falls within the scope of a prior [administrative charge], or (2) falls within the scope of the [administrative] 'investigation which arose out of it.'" *Robinson v. Dalton*, 107 F.3d 1018, 1025 (3d Cir. 1997) (quoting *Waiters v. Parsons*, 729 F.2d 233, 235 (3d Cir. 1984); *see also Simko v. United States Steel Corp*, 992 F.3d 198, 207 (3d Cir. 2021). A retaliation claim fails on the first prong where "no allegations of retaliation appeared on the face of [the plaintiff's] original [administrative] charge." *Simko*, 992 F.3d at 208; *see also Culpepper v. Covanta Energy Servs., Inc.*, No. 1:23-CV-01298, 2024 WL 3403136, at *3 (M.D. Pa. July 12, 2024).

Regarding the second prong, the Third Circuit has rejected a *per se* rule which "treat[s] post-charge claims of retaliation as exhausted when they arise during the pendency of a prior charge." *Simko*, 992 F.3d at 207; *see also Nesby v. Yellen*, No. 2:18-CV-01655-CCW, 2022 WL

24

1091916, at *5 (W.D. Pa. Apr. 12, 2022). Instead, "the Court must 'examine carefully the prior pending [administrative charge] and the unexhausted claim on a case-by-case basis before determining that a second [charge] need not have been filed.'" *Simko*, 992 F.3d at 207. Even if the alleged retaliation was in response to filing the initial administrative charge, a plaintiff must file a separate administrative charge alleging retaliation if a retaliation claim is not "within the reasonable scope of the investigation into the *allegations of the original charge*." *Simko*, 992 F.3d at 213 (emphasis in original); *see also Robinson*, 107 F.3d at 1024. When comparing a retaliation claim to an administrative charge, courts consider whether the retaliation claim has factual similarities to the allegations in the administrative charge, falls "within the 'gravamen' of the initial charge," or whether "the two sets of allegations advance the same theory of discrimination [or retaliation]." *Simko*, 992 F.3d at 211 (citations omitted); *see also Tudor*, 2022 WL 1004874, at *4.

DiBlasi avers that her retaliation claims relate to her original administrative complaint because "[t]he retaliation that Dr. DiBlasi has alleged arose directly from her original PHRC/EEOC complaint. Defendants retaliated by denying her physical access to the facility to complete her training in person or to obtain various certifications, delaying her licensure, and excluding her from participating in graduation ceremonies." (Doc. 32, at 28). However, this argument alone is insufficient because the Third Circuit has rejected a *per se* rule that a plaintiff is not required to file a new administrative charge where the retaliation is allegedly in response to filing the original charge. *See Simko*, 992 F.3d at 213. Nonetheless, the Court finds that DiBlasi's retaliation claims fall within the scope of the EEOC investigation which arose out of DiBlasi's administrative charge. *Robinson*, 107 F.3d at 1025. Amongst other allegations, DiBlasi's EEOC charge alleges that Defendants retaliated against DiBlasi after

she requested reasonable accommodations. (Doc. 26-9, at 13). Although DiBlasi's complaint does not pursue a retaliation claim relating to DiBlasi's requests for accommodations, the complaint alleges that the same Defendants retaliated against DiBlasi for filing an administrative charge. (Doc. 1, ¶¶ 168-82). DiBlasi was not required to file an additional administrative charge because allegations that the same Defendants continued to retaliate against DiBlasi is within the scope of her original charge. *See Burton v. Pennsylvania State Police,* 990 F. Supp. 2d 478, 500 (M.D. Pa. 2014), *aff'd,* 612 F. App'x 124 (3d Cir. 2015) (finding that a plaintiff was not required to file an additional administrative charge where the original administrative charge alleged retaliation and the complaint alleged "additional forms of related retaliation"); *see also Finney v. Delaware Dep't of Transportation,* No. CV 22-1059, 2024 WL 3273497, at *5 (D. Del. July 2, 2024) (finding the same). Accordingly, the Court finds that DiBlasi's retaliation claims are properly exhausted and will consider Counts VI, VII, and VIII on the merits. (Doc. 1, ¶¶ 168-82)

    B.  D<small>I</small>B<small>LASI FILED HER COMPLAINT NINETY DAYS AFTER RECEIVING NOTICE OF HER RIGHT TO SUE.</small>

Defendants aver that even if DiBlasi exhausted her administrative remedies, Counts II, IV, VI, and VII, DiBlasi's ADEA and Title VII claims, are time-barred because DiBlasi is presumed to have received her right to sue letter from the EEOC on March 6, 2023, and failed to file a complaint with this Court within ninety days of that date. (Doc. 30, at 19-21). DiBlasi avers that the ninety-day period to file a complaint began three days after the EEOC mailed DiBlasi notice of her right to sue letter on April 13, 2023, and DiBlasi filed her complaint within those ninety days. (Doc. 32, at 14-16).

Title VII and the ADEA require a plaintiff to file a complaint within ninety days of receiving a right to sue letter from the EEOC. 42 U.S.C.A. § 2000e-5 (f)(1); 29 U.S.C.A. § 626(e). However, for the ninety-day time limit to begin, the EEOC must send a communication to the plaintiff clearly explaining that their ninety-day time limit has begun, and this requirement is not met when the EEOC only posts a right to sue letter on an online portal without providing a more specific communication. *See Hayes v. New Jersey Dep't of Hum. Servs.*, 108 F.4th 219, 223 (3d Cir. 2024). It is insufficient for the EEOC to only notify a plaintiff or their counsel that a document has been uploaded to an online portal. *See Hayes*, 108 F.4th at 223-24; *see also Farrow v. Pittsburgh Pub. Sch.*, No. 2:23-1086, 2024 WL 3539544, at *8 (W.D. Pa. July 25, 2024). If the EEOC mails the plaintiff a letter which contains an explanation of the ninety-day time limit and the record has no evidence of when the plaintiff received that letter, the 90-day timer begins three days after the EEOC mailed the letter. *See Hayes*, 108 F.4th at 222.

Here, the record includes a right to sue letter dated March 3, 2023, and a mailed notice regarding that right to sue letter dated April 13, 2023. (Doc. 26-8, at 5-6). The mailed April 13, 2023, notice states that on March 3, 2023, the "EEOC sent [DiBlasi] an email notification that [the] EEOC had made a decision regarding the above-referenced charge and advised [her] to download a copy of the decision document from the Portal." (Doc. 26-8, at 5). The mailed notice then states "[p]lease note that if you want to pursue this matter further in court, you must file a lawsuit within 90 days of the date you receive the Notice." (Doc. 26-8, at 5). There is no evidence in the record indicating DiBlasi received a communication prior to April 13, 2023, explaining that the ninety-day time limit had begun or that she had received any communication beyond an email informing her that there was a new entry posted on the

portal. (Doc. 26-8, at 5). Thus, any communication prior to the April 13, 2023, letter was insufficient to start the ninety-day time limit. *See Hayes*, 108 F.4th at 223-24; *see also Farrow*, 2024 WL 3539544, at *8. The ninety-day time limit is thus presumed to have begun three days after April 13, 2023, and DiBlasi filed this suit within 90 days of April 16, 2023. (Doc. 1). Accordingly, DiBlasi filed a complaint within 90 days of receiving her right to sue letter and the Court will consider the merits of DiBlasi's exhausted hostile work environment claims in Counts I, II, III, IV, and V and DiBlasi's retaliation claims in Counts VI, VII, and VIII. (Doc. 1, ¶¶ 58-182).

C. DiBlasi fails to establish a *prima facie* case of a hostile work environment.

Turning to the merits of DiBlasi's remaining claims, Counts I, II, III, IV, and V's exhausted claims allege Defendants subjected DiBlasi to a hostile work environment based on her age, gender, and disability. (Doc. 1, ¶¶ 58-167). Defendants argue that DiBlasi fails to establish a *prima facie* case of a hostile work environment because DiBlasi has failed to present evidence from which a reasonable jury may infer that she suffered pervasive and regular intentional discrimination. (Doc. 30, at 38-41). DiBlasi counters that she has presented testimony, administrative filings, and psychological records which create a genuine dispute of fact regarding severe and pervasive discrimination. (Doc. 32, at 21-27).

Title VII, the ADEA, and the PHRA prohibit employers from creating a "hostile work environment amounting to employment discrimination." *Faragher v. City of Boca Raton*, 524 U.S. 775, 780 (1998); *see also Renna v. PPL Elec. Utilities, Inc.*, 207 A.3d 355, 368 (Pa. Super. 2019) (finding the PHRA prohibits creating a hostile work environment); *see also Johnson v. Philadelphia Hous. Auth.*, 218 F. Supp. 3d 424, 438 (E.D. Pa. 2016) (finding the ADEA

28

prohibits creating a hostile work environment). Courts consider Title VII, ADEA, and PHRA hostile work environment claims under the same standard. *See Burgess v. Dollar Tree Stores, Inc.*, 642 F. App'x 152, 155 (3d Cir. 2016) (nonprecedential); *see also Johnson*, 218 F. Supp. 3d at 438. To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must present evidence from which a reasonable jury may conclude "(1) the employee suffered intentional discrimination because of their [protected class]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [protected class] in that position; and (5) the existence of *respondeat superior* liability." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)).

Defendants aver that DiBlasi has failed to present evidence from which a reasonable jury may infer that DiBlasi was subjected to pervasive and regular intentional discrimination. (Doc. 30, at 38-39). Under this requirement, a plaintiff must allege they were subjected to more than "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)." *Faragher*, 524 U.S. at 788 (citations omitted). Generally, a plaintiff's testimony that they have been given less favorable or more intensive work assignments is insufficient to create a genuine dispute of fact regarding pervasive and regular intentional discrimination. *Woodard v. PHB Die Casting*, 255 F. App'x 608, 609 (3d Cir. 2007) (nonprecedential); *see also Ackie v. Philadelphia Gas Works*, No. CV 19-4275, 2021 WL 2375876, at *9 (E.D. Pa. June 10, 2021). A plaintiff also cannot create a genuine dispute of fact regarding pervasive and regular intentional discrimination by listing a series of incidents that are only "unpleasant" and occurred over an extended period of time. *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85,

29

97 (3d Cir. 2020) (nonprecedential); *see also Fitzgerald v. Glenn Ins., Inc.*, No. 120CV14891, 2023 WL 2728818, at *14 (D.N.J. Mar. 31, 2023). Further, evidence of a plaintiff's subjective beliefs or feelings that she was subjected to a hostile work environment is not sufficient to create a genuine dispute of fact regarding pervasive and regular intentional discrimination. *See Garnett v. Bank of Am.*, 243 F. Supp. 3d 499, 509 (D. Del. 2017); *see also Burns v. McDonough*, No. 2:23-CV-01810, 2024 WL 4205577, at *9 (E.D. Pa. Sept. 16, 2024).

Here, DiBlasi avers that a reasonable jury may infer that she suffered pervasive and regular intentional discrimination based on her testimony that other residents, her supervisors, and residency leadership regularly disrespected her and based on her testimony that residency leadership required her to complete additional assignments, shifts, certifications, and rotations that younger male residents were not required to complete.[9] (Doc. 31-11, at 20, 43; Doc. 32, at 22-27). DiBlasi also provides a document she previously filed with the EEOC listing various incidents in which other residents disrespected her, residency supervisors appeared to disparage her behind her back, residency leadership would not take various concerns she raised seriously, and residency leadership required her to complete additional assignments, certifications, shifts, and rotations younger male residents were not required to complete. (Doc. 31-11, at 440-61; Doc. 32, at 26). The incidents listed in this document occurred between 2019 and 2022 and vary in seriousness. (Doc. 31-11, at 440-61). For

---

[9] DiBlasi also contends that a reasonable jury may infer that she suffered pervasive and regular intentional discrimination based on Defendants denying her residency transfer requests and deceiving her into undergoing a neuropsychiatric evaluation to dispute her ADD diagnosis. (Doc. 32, at 25-27). As discussed *supra* Section III.A.1, these claims are both unexhausted and constitute discrete acts that cannot be aggregated into a hostile work environment claim. Thus, the Court will not consider them as part of DiBlasi's hostile work environment claims.

example, the document lists minor incidents such as Phykitt allegedly embarrassing DiBlasi by asking her about her post-graduation plans and Defendants not granting DiBlasi's requests to replace the hand sanitizer used in dispensers. (Doc. 31-11, at 451, 457). However, the document also raises more serious allegations such as a male nurse hitting DiBlasi's hand to prevent her from touching a monitor. (Doc. 31-11, at 450-51).

A reasonable jury cannot infer that DiBlasi suffered pervasive and regular intentional discrimination based on her testimony and EEOC filing. (Doc. 31-11, at 20, 43, 440-61). DiBlasi's evidence that she was disrespected and disparaged by other residents and supervisors is insufficient to create a genuine dispute of fact regarding pervasive and regular intentional discrimination because DiBlasi provides no examples of mistreatment beyond "unpleasant" interactions with other residents and supervisors which occurred over an extended period of time. *See Wright,* 822 F. App'x at 97; *see also Fitzgerald*, 2023 WL 2728818, at \*14. The only examples of derogatory comments DiBlasi provides are two comments from a senior resident stating that it is "difficult to learn after a certain age." (Doc. 31-11, at 441). Such comments are not sufficiently extreme for a reasonable jury to infer pervasive and regular intentional discrimination. *See Faragher*, 524 U.S. at 788; *see also Woodard,* 255 F. App'x at 609-10. Further, a reasonable jury may not infer that DiBlasi was subjected to pervasive and regular intentional discrimination based on DiBlasi's testimony that residency leadership required her to complete additional assignments, rotations, shifts, and certifications because testimony that a plaintiff was assigned additional unpleasant tasks or work not assigned to other employees is insufficient to create a genuine dispute of fact regarding regular and pervasive intentional discrimination. *See Woodard,* 255 F. App'x at 609; *see also Ackie*, 2021 WL 2375876, at \*9.

31

DiBlasi avers that "if a single incident alone can form the basis of a hostile work environment [claim]" the Court should find a genuine dispute of fact regarding pervasive and regular discrimination based on DiBlasi's testimony that she "was yelled at and struck by a male nurse because she should have been 'more timid.' The resulting investigation determined that the nurse acted appropriately and Dr. DiBlasi was banned from the floor of the ICU where he worked." (Doc. 32, at 25). The Court notes that DiBlasi does not cite to the record when arguing this incident alone is sufficient to sustain her hostile work environment claim. (Doc. 32, at 25). DiBlasi's description of this incident in her EEOC document alleges that a nurse "hit [her] hand" because he did not want her to touch a monitor. (Doc. 31-11, at 450). DiBlasi's description of the incident also states that an "Internal Medicine senior resident" told her that she was "no longer allowed into the 7th floor ICU. . . because the nurses were uncomfortable with [her] presence there." (Doc. 31-11, at 450-51). Hostile work environment claims involve "similar conduct by the same individuals, suggesting a persistent, ongoing pattern.'" *Doe*, 850 F.3d at 566. DiBlasi's hostile work environment claims involve allegations and testimony that other residents in DiBlasi's residency, DiBlasi's supervisors, and her residency leadership created a hostile work environment, and this incident involved nursing staff and a resident from another residency. (Doc. 31-11, at 450-51; Doc. 32, at 22-27). However, even if this incident did involve the same individuals as the rest of DiBlasi's hostile work environment allegations, isolated incidents, even those that involve non-extreme physical contact, are not alone sufficient to create a genuine dispute of fact regarding pervasive and regular intentional discrimination. *See King v. City of Philadelphia*, 66 F. App'x 300, 305 (3d Cir. 2003) (nonprecedential) (finding that isolated incidents of a coworker shoving and threatening a plaintiff were insufficient to create a genuine dispute of fact regarding pervasive

and regular discrimination). A reasonable jury also may not infer pervasive and regular intentional discrimination based on DiBlasi's assertions that residency leadership and human resources did not take the incident seriously enough. (Doc. 31-11, at 450-51). DiBlasi's EEOC filing states that human resources investigated the incident. (Doc. 31-11, at 451). Defendants present testimony from Dr. Linda Berry ("Berry"), who was the human resources director at the hospital where this incident occurred, stating that she investigated the incident and found that the nurse did not strike DiBlasi after talking to five or six witnesses to the incident. (Doc. 31-17, at 4-6). DiBlasi does not present any evidence showing deficiencies in this investigation, and an isolated incident of human resources not taking a plaintiff's desired actions is insufficient for a reasonable jury to conclude that a plaintiff suffered pervasive and regular intentional discrimination. *See Fields*, 696 F. Supp. 3d at 116 (rejecting a plaintiff's argument that human resources not taking racist graffiti seriously created a genuine dispute of fact regarding pervasive and regular intentional discrimination).

DiBlasi finally attempts to establish a genuine dispute of material fact regarding pervasive and regular intentional discrimination by presenting a report written by psychologist Dr. Robert Gordon which concludes that DiBlasi suffers from "Complex Posttraumatic Stress Disorder due to her experiencing a continued toxic and discriminatory work environment from about 2019 to 2023." (Doc. 31-9, at 6; Doc. 32, at 26). However, this is evidence that DiBlasi had a genuine subjective belief that she was subjected to a hostile work environment, and evidence of a plaintiff's subjective belief that she experienced discrimination is not sufficient for a reasonable jury to infer pervasive and regular intentional discrimination. *See Garnett*, 243 F. Supp. 3d at 509; *see also Burns*, 2024 WL 4205577, at *9. Accordingly, the Court finds that there is no genuine dispute of fact regarding *DiBlasi's prima*

*facie* case of a hostile work environment and the Court **GRANTS** Defendants' motion for summary judgment on Counts I, II, III, IV, and V. (Doc. 24).

    D.  D<small>I</small>B<small>LASI</small> <small>FAILS TO ESTABLISH A</small> *<small>PRIMA FACIE</small>* <small>CASE OF RETALIATION.</small>

    Counts VI, VII, and VIII allege Defendants violated the ADEA, Title VII, and the PHRA by retaliating against DiBlasi after she filed her administrative complaint. (Doc. 1, ¶¶ 168-82). Defendants aver that DiBlasi fails to establish a *prima facie* case of retaliation because she fails to present evidence from which a reasonable jury may infer that she suffered an adverse action, and that retaliation caused an adverse action against her. (Doc. 30, at 42-49). DiBlasi does not respond to this argument.

    Title VII and the ADEA state "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment. . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C.A. § 2000e-3; 29 U.S.C.A. § 623 (d). Similarly, the PHRA provides that it is unlawful for an employer to "discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Stat. Ann. § 955 (d). These provisions prohibit an employer from retaliating against an employee for engaging in protected activity under the acts and courts analyze Title VII, ADEA, and PHRA retaliation claims together. *Daniels v. Sch. Dist. of Philadelphia,* 776 F.3d 181, 192 (3d Cir. 2015).

    To survive a motion for summary judgment, a plaintiff must first establish a *prima facie* case of retaliation. *Moore,* 461 F.3d at 340. To establish a *prima facie* case, "a plaintiff must tender evidence that: '(1) she engaged in activity protected [under the statute]; (2) the

employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" *Moore*, 461 F.3d at 340–41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Defendants challenge DiBlasi's *prima facie* case of retaliation on the second and third requirements. (Doc. 30, at 42-49). To meet the second requirement, "the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Daniels*, 776 F.3d at 195 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Regarding the second prong, "[c]ases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). However, temporal proximity is only one factor considered when assessing a causal link and "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Kachmar*, 109 F.3d at 177. While a large delay between a protected action and an adverse action does not alone preclude a genuine dispute of fact regarding causation, a reasonable jury may not infer causation where there is no evidence that a defendant subjected a plaintiff to any adverse actions or hostility for several months after a protected action. *See Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 849 (W.D. Pa. 2016); *see also Niven-Himes v. Pennsylvania Hosp. of Univ. of Pennsylvania Health Sys.*, No. 2:20-CV-00558, 2021 WL 5298982, at *6 (E.D. Pa. Nov. 15, 2021).

DiBlasi does not respond to Defendants' arguments regarding her *prima facie* case of retaliation, however, DiBlasi's statement of material facts presents DiBlasi's own testimony that Defendants took several adverse actions against her after she filed her administrative charge including denying her access to facilities, allowing her licensing to expire, only allowing her to have telehealth patient visits, denying her access to residency records, and not allowing her to attend a graduation ceremony.[10] (Doc. 31, at 89-90, Doc. 31-11, at 30-35). DiBlasi's testimony is vague and unclear as to who is responsible for the relevant alleged adverse actions and when the actions occurred. (Doc. 31-11, at 30-35). However, even if the Court accepts the as true that a reasonable jury may infer that DiBlasi suffered adverse actions based on her testimony, DiBlasi fails to present evidence from which a reasonable jury may infer causation. The parties agree that the EEOC notified Defendants of DiBlasi's administrative charge on July 26, 2022, and that DiBlasi was on a leave of absence between July 2022 and March 2023. (Doc. 25, at ¶¶ 265-67; Doc. 31, at 63). The earliest alleged adverse action mentioned in DiBlasi's statement of material fact and testimony was that DiBlasi requested to return to work on February 28, 2023, and Defendants delayed her licensing. (Doc. 31, at 62-64; Doc. 31-11, at 30-35). Accordingly, a reasonable jury may not infer causation because there is no evidence that Defendants subjected DiBlasi to any adverse actions or

---

[10] DiBlasi also cites the testimony of Berry, a human resources director, as evidence that DiBlasi was not allowed to attend a graduation ceremony. (Doc. 31, at 90-91). However, Berry did not testify that DiBlasi was not allowed to attend a graduation ceremony. (Doc. 31-17, at 22). Rather, DiBlasi's counsel asked Berry if she had any personal knowledge of why DiBlasi was not allowed at certain graduation ceremonies and Berry replied, "I. . . do not have any knowledge." (Doc. 31-17, at 22). DiBlasi also cites a picture of a crumpled and ripped diploma but does not state who damaged the diploma and why. (Doc. 31, at 91; Doc. 31-17, at 42).

hostile treatment for seven months after she filed her administrative charged *See Bumbarger, 170 F. Supp. 3d at 849*; *see also Niven-Himes,* 2021 WL 5298982, at *6. Accordingly, DiBlasi has not established a *prima facie* case of retaliation. Defendants' motion for summary judgment is **GRANTED** regarding Counts VI, VII, and VIII. (Doc. 24).

IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. (Doc. 24). DiBlasi's complaint is **DISMISSED** with prejudice. (Doc. 1). The Clerk of Court is directed to **CLOSE** this case.

An appropriate Order follows.

Dated: September 29, 2025                         *s/ Karoline Mehalchick*
                                                  **KAROLINE MEHALCHICK**
                                                  **United States District Judge**